MORGAN & MORGAN
COMPLEX LITIGATION GROUP
Michael F. Ram (SBN 104805)
mram@forthepeople.com
Marie N. Appel (SBN 187483)
mappel@forthepeople.com
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Telephone: (415) 358-6913
Facsimile: (415) 358-6293

*Counsel for Plaintiff and the Proposed Classes*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| HENRY SO, individually and on behalf of all other similarly situated individuals,<br><br>        Plaintiff,<br><br>    v.<br><br>HP, INC. d/b/a HP COMPUTING AND PRINTING INC., a Delaware Corporation<br><br>        Defendant. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR**<br>  1) **Violations of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(5)(A), § 1030(a)(2)(C), and § 1030(a)(4)**<br>  2) **Violation of the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502, et seq.**<br>  3) **Violations of the Unfair Competition Law – Unlawful Prong, Cal. Bus. & Prof. Code § 17200, et seq. ("UCL")**<br>  4) **Violations of the Unfair Competition Law – Unfair Prong, Cal. Bus. & Prof. Code § 17200, et seq. ("UCL")**<br>  5) **Violations of the Unfair Competition Law – Fraudulent Prong, Cal. Bus. & Prof. Code § 17200, et seq. ("UCL")**<br>  6) **California False Advertising Law Cal. Bus. & Prof. Code § 17500**<br>  7) **Fraud By Omission**<br>  8) **Violation of the California Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1770(a)(5), et seq.**<br><br>**JURY TRIAL DEMANDED** |

CLASS ACTION COMPLAINT

Plaintiff, Henry So, individually and on behalf of all others similarly situated, brings this Class Action Complaint against Defendant HP, Inc., d/b/a HP Printing and Computing Inc., ("HP") and makes the following allegations based on personal knowledge as to facts pertaining to his own experiences and on information and belief as to all others, and alleges as follows against Defendant:

## **NATURE OF THE ACTION**

1.      HP wrongfully compels users of its printers to buy and use only HP ink and toner supplies ("HP Original Supplies") by transmitting firmware updates without authorization to HP printers over the Internet that lock out its competitors' refilled, new build, or remanufactured ink and toner supply cartridges ("third-party cartridges").[1] HP's firmware "updates" act as malware—adding, deleting or altering code, diminishing the capabilities of HP printers, and rendering third-party cartridges incompatible with HP printers ("malicious firmware updates"). As a result, and by HP's design, Plaintiff and Class Members who reasonably and lawfully buy competitors' much less costly and equally effective supplies are left with useless printers and supply cartridges.

2.      HP has marketed and sold its standard HP printers as capable of printing using HP Original Supplies as well as refilled or third-party cartridges.

3.      HP consistently markets its HP Original Supplies as superior to competing third-party cartridges. HP states that using HP Original Supplies "provides the best print quality."[2] HP also represents that HP Original Supplies are the "most reliable" and thus require "less service."[3] HP's public statements and advertisements imply that customers have a choice whether to use HP Original Supplies.

_____

[1] Third-party cartridges are produced and sold by a variety of HP's competitors. Third-party compatible cartridges can be categorized as: remanufactured, refilled, or new build compatibles.
Remanufactured and refilled cartridges are HP Original cartridges that are used and subsequently collected, inspected, cleaned, fit with new or reconditioned parts, refilled with ink or toner, and quality tested so that its capability to print has been restored. Some customers choose to refill their HP Original cartridges themselves.
New build compatible cartridges are new replacement cartridges that are made by a third-party in imitation of an Original cartridge with a shell, internal components and ink or toner that is not manufactured or distributed by the Original printer manufacturer.
[2] *See e.g.* Exhibit 1 (HP, INC., Brief, *Original HP Toner Cartridges* dated December 2019) (detailing HP's messaging surrounding the benefits of choosing HP Original Supplies for HP's internal use and use with HP Partners.).
[3] *Id.*

CLASS ACTION COMPLAINT                    1

4.      HP consistently asserts that its printers provide HP's customers with a "flexible choice" between: (a) using the "standard printing model" – wherein a consumer purchases an HP Printer and may choose whatever supplies that consumer desires when resupplying that printer's ink, or (b) agreeing to use only HP Original Supplies by signing up for Instant Ink or HP+ programs and thus entering the "End to End System."

5.      When purchasing HP printers, Plaintiff and Class Members reasonably believed that choosing the standard printing model would allow for the free exercise of a "flexible choice" – *i.e.,* choosing whether to purchase HP Original Supplies or third-party compatible cartridges.

6.      Even though HP sells ink and toner at substantial premiums over its competitors, HP is able to maintain and increase its market share in the aftermarket for HP compatible ink supplies ("HP InkJet Cartridges") only because HP's base class of printers contain microchips designed to cause printer malfunctions if third-party cartridges are installed once the printers receive a malware transmission via a malicious firmware update.

7.      HP's malware transmission is unannounced, automatic (on the part of printer owners), and unsolicited.  The firmware update, or the portion of the firmware update that renders third-party ink and toner incompatible with HP printers, serves no legitimate business purpose.  Even if other portions of the transmission had some arguable security or quality benefit, the secretive, automatic, and misleading manner in which the firmware updates are carried out unlawfully deprives Plaintiff and Class Members of the fully informed choice of either choosing to accept the firmware update and the represented benefits accompanying it, or to decline the update and receive the benefits of using the ink cartridges of their choice.

8.      As a result of HP's malware, HP printer owners who lawfully use significantly less expensive ink purchased from third parties are forced to buy HP Original cartridges, which HP sells at substantial premiums, or are deprived of the use of their printers until third parties can develop work arounds to again offer products in competition with HP.  HP harms competition because it deprives its printer users of the choice whether to purchase more expensive HP Original Supplies or the less expensive supplies of lawful competitors.

CLASS ACTION COMPLAINT                    2

9.      In furtherance of the unlawful scheme, HP falsely represents and omits material facts regarding the reason for the sudden inability of its printers to function without HP Original cartridges. HP printers using third-party or refilled cartridges display error messages falsely stating that that the printer has a "supply problem" or "cartridge problem" or that the cartridges were not "communicating properly with the printer" and needed to be reinstalled or replaced. In fact, no such problem existed until HP intentionally caused one by sending malware to its printers to render third-party cartridges incompatible with its products.

10.      The incompatibility was not an unintended consequence of HP pursuing or implementing its legitimate business interests or conducting lawful quality assurance, security updates, or product improvements. The incompatibility was the point of the firmware updates, or the portion of the firmware updates that caused the incompatibility to prevent its printers from working with competitors' products. Third-party supplies are not collateral damage; they are the target.

11.      Due to the transmission and by HP's design, Plaintiff's and Class Members' Class Printers and ink cartridges were rendered incompatible and inoperable. Plaintiff would not have purchased an HP printer had he known HP was engaged in and would engage in such conduct. Had Plaintiff and Class Members known that HP would surreptitiously render third-party cartridges incompatible, Plaintiff and Class Members would not have purchased an HP Printer or would have paid less for their printers. As a direct and proximate result of HP's misconduct, Plaintiff and Class Members sustained damages, including but not limited to the loss of the value of the InkJet cartridges they purchased that are no longer compatible with their printers, loss of time and effort to diagnose the damage to their printers and to determine what remedial measures to take, the need to purchase expensive HP Original cartridges, uncertainty in the functioning of their printers and supply cartridges, and future remedial costs.

12.      HP's malware transmission and false statements injured and will continue to injure its customers. HP's conduct is unlawful under federal and state laws prohibiting hacking and other computer crimes, as well as state statutory prohibitions against deceptive and unfair trade practices.

13.     Plaintiff therefore seeks actual, statutory, and exemplary damages, restitution, and an injunction requiring HP to reverse the effects of its malware transmissions insofar as they render once-compatible ink cartridges obsolete and prohibiting HP from sending such transmissions in the future without obtaining the fully informed consent of each printer owner.

## JURISDICTION AND VENUE

14.     This Court has federal subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 as well as pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), as the amount in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because many putative class members are citizens of a different state than Defendant.

15.     Additionally, the Court has original federal subject matter jurisdiction over this matter pursuant to 28 U.S.C. §1331 because it arises, at least in part, out of a question of federal law, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq*.

16.     Venue is proper in this District pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2) because Defendant conducts its affairs in this District and a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

17.     This Court has personal jurisdiction over Defendant because its principal place of business is in California. Additionally, Defendant is subject to specific personal jurisdiction in this State because a substantial part of the events and conduct giving rise to Plaintiff's and the Class claims occurred in this State.

## PARTIES

18.     Plaintiff Henry So is a California citizen. Plaintiff So owns three Class Printers. Plaintiff purchased these printers new in California from Best Buy and Amazon.

19.     Defendant HP is a California corporation with a principal place of business at Defendant HP, INC. d/b/a HP Computing and Printing Inc. is a Delaware corporation with its principal place of

business located at 1501 Page Mill Road, Palo Alto, California, 94304. HP regularly conducts business throughout California and in this judicial district.

## COMMON FACTUAL ALLEGATIONS

20.      HP is the "market leader" in the printing industry and is the number one seller of home and office, and graphics printers in the United States.[4]

21.      HP also sells associated HP-branded ink and toner cartridges for use in HP printers ("HP Original Supplies").

22.      Printing is one of the largest and most profitable of HP's business segments. In 2021, HP's total net revenue was $63,487,000,000.[5] HP's net revenue from Printing was $20,128,000,000 in 2021.[6] HP's operating profit margins on Printing means that Printing revenue accounts for 50-60% of HP's operating profit, year over year. [7] Sales of HP Original Supplies, such as toner and ink, make up a large portion of HP's net revenue – in 2021, HP's revenue from Supplies alone was $12,632,000,000.[8]

23.      HP's Printing segment generates this massive amount of revenue through sales in two separate markets: the Consumer and Commercial Hardware ("printer") foremarket and the HP InkJet Cartridge aftermarket.

---

[4] *See* page 10, *Strategic & Financial Plan for Value Creation* (Feb. 24, 2020), attached as Ex. 99-2 to HP Inc. Form 8-K, submitted to Securities and Exchange Commission on Feb. 24, 2020, *available at* https://s2.q4cdn.com/602190090/files/doc_financials/2020/q1/Value-Creation-for-web-posting-(1).pdf (last visited Mar. 23, 2022) ("2020 Strategic Plan").
[5] HP earned $22,447,000,000 of that revenue in the United States. *See* HP INC. and Subsidiaries, Form 10-K - For the Fiscal Year ended October 31, 2021 https://s2.q4cdn.com/602190090/files/doc_financials/2021/q4/0302cd18-964e-4bee-b427-d313202a7dd9.pdf (last visited Mar. 22, 2022) ("2021 10-K").
[6] 2021 10-K at 69;
[7] 2021 10-K at 69. *See* 2020 Q4 Earnings Presentation at 8, *available at* https://s2.q4cdn.com/602190090/files/doc_events/2020/Q42020/Q420-HP-Inc.-Earnings-Presentation-FINAL.pdf (last visited Jan. 31, 2022).
[8] 2021 10-K at 69. HP's net revenue from supplies (e.g., toner and ink) alone in 2019 was $12.9 billion. Consistent with its razor and blades model, its net revenues from hardware (e.g., printers, among others) came to $7.1 billion in 2019.

CLASS ACTION COMPLAINT                          5

24.     In the foremarket, HP's offers dozens of models of InkJet Printers, Copiers and All-in-Ones ("printers"). Each model of printer is only compatible with the associated model of ink or toner cartridge.

25.     For a cartridge to be compatible with a printer, both the hardware – *i.e.*, the physical form of the cartridge – and the software – *i.e.*, the code written onto the chips embedded in both devices – must align. For example, the OfficeJet 6978 will only print if a compatible cartridge model – the Model 902 or 902XL cartridges – is installed.

26.     Unlike the fixed and upfront cost of a printer, the ink and toner cartridges used in printers are consumable and thus must be replenished periodically. Once a consumer purchases a printer,[9] that consumer must also purchase compatible cartridges to continue using that printer. Thus, the final price of a printer is difficult to estimate at the point of sale.

27.     The consumer purchases those compatible cartridges in the aftermarket for ink and toner. There, the consumer can choose whether to purchase new cartridges from the printer manufacturer or to purchase a compatible cartridge from a third-party.

28.     Thus, once a customer purchases an InkJet HP printer in the printer foremarket, that customer must purchase the affiliated cartridge models of HP InkJet Cartridges in the aftermarket.

### A.     HP's Standard Business Model

29.     Within its Printing segment, HP has traditionally employed a "razor and blades" business model, where the bulk of its profit is derived from its sales of consumable supplies (like ink and toner) instead of from the sales of HP printers themselves.[10]

30.     For companies employing a "razor and blades" business model for printers, most revenues and profits come from consumers repeatedly returning to purchase the necessary cartridges.

---

[9] Most printers come with an initial "Startup" supply cartridges, typically with reduced printing capacity, that enable the customer to setup the printer and print a limited number of pages before a resupply is needed.
[10] Anirudh Dhebar, "Innovating Around the Classic Razor-And-Blades Pricing Model" Babson College, April 2017. https://www.babson.edu/academics/executive-education/babson-insight/strategy-and-innovation/razor-and-blades-pricing-model/# (last visited Mar. 22, 2022).

CLASS ACTION COMPLAINT                    6

31.     HP printers were traditionally sold at a substantial discount with the intent on profiting on the sales of consumable supplies like toner and ink over the lifetime of the printer.[11] Because HP's profit margin on the initial printer sale is much lower than that of its subsequent ink sales, HP depended on recurring sales of its extremely high-priced HP Original Supplies as the lifeblood of its business[12]

32.     HP's Original Supplies are so excessively priced that commentators have remarked that the price per ounce of HP's ink and toner range between the prices of silver and gold (at $4,731 per gallon).[13]

33.     The critical component of a successful razor and blades business model is that the market for the replacement consumable(s) must be closed to competitors.[14] If consumers can purchase "blades" from anyone else, the model fails, as it cuts off the revenue stream generated from the exclusive sale of replacement consumables, or, at the very least, renders the aftermarket for replacement consumables substantially more competitive, driving prices down.[15]

34.     HP acknowledges that for some consumers, non-original inkjet cartridges ("third-party cartridges") are sufficient to meet its customers' printing needs. Third-party cartridges are between twenty-five to seventy-five percent (25-75%) less expensive than HP Original cartridges.[16]

---

[11] *See, e.g.*, *HP Investor Tech Talk Transcript,* SEEKING ALPHA (Dec. 3, 2020), https://seekingalpha.com/article/4392889-hp-inc-hpq-hp-investor-tech-talk-continuing-prints-evolution-launch-of-hp-transcript ("2020 Investor Tech Talk"); *id.* ("[W]e lose money about 25% of our customers. This is due to the fact that we invest money upfront in placing hardware, and we don't make that money back over the life of the product.").

[12] *See* 2019 10K, HP INC., at 7, https://s2.q4cdn.com/602190090/files/doc_financials/2019/ar/hp-inc_10-ka-(1).pdf (last visited Feb. 7, 2022) ("2019 Annual Report").

[13] *See* Eduardo Porter, "Why Printer Ink Is the Other 'Black Gold.'" ALL THINGS CONSIDERED, NPR, May 24, 2012, https://www.npr.org/2012/05/24/153634897/why-printer-ink-is-the-other-black-gold (last visited Mar. 7, 2020).

[14] *See* Dhebar, *Razor-and-Blades*, *supra* note 10.

[15] *Id.*

[16] *See, e.g.*, Complaint at 4, *Hewlett-Packard Co. v. LD Products, Inc.*, No. 5-cv-00494 (N.D. Cal. filed Feb. 4, 2013) (describing the aftermarket for HP InkJet Cartridges and stating that third-party cartridges offered by HP's competitors in that aftermarket are twenty-five to seventy-five percent less expensive than HP Original cartridges.).

CLASS ACTION COMPLAINT                    7

35.    HP competes with sellers of third-party cartridges in the aftermarket for HP InkJet Cartridges.[17] Customers in that market substitute between HP Original cartridges and third-party cartridges for use in their HP Printer.

36.    As a result, HP fears competition in its "Printing Supply Business" – the HP InkJet Cartridge aftermarket – from what it refers to as "independent suppliers" who offer "non-original supplies (including imitation, refill or remanufactured alternatives)" that are "often available for lower prices."[18]

37.    These competitors present a risk to HP's critical Supplies revenue, and HP's "[n]et revenue for Supplies [in 2019] decreased 4.8% as compared to the prior-year period, primarily due to demand weakness."[19]

38.    HP's public filings and internal investor presentations further indicate that competitors in the HP InkJet Cartridge aftermarket have continually eaten into HP's market share for HP InkJet Cartridges. HP previously warned investors that "[f]inancial performance could also decline due to increased competition from … non-original supplies"[20] and "our supplies business has recently experienced declining revenues due to declines in market share, installed base and usage, and increased customer pricing sensitivity."[21]

**B.    HP's New Strategy to Monopolize the HP InkJet Cartridge Aftermarket**

39.    In recent years, HP has "modernized" its business strategy in Print – HP charges a higher upfront price for the printer hardware if a customer chooses the flexibility of the "standard printing model" and offers lower prices for customers who agree to use the "End to End" system.s.[22]

---

[17] *See, e.g., id.*; ex. 1 (describing HP's advertising that touts HP Original Supplies' superiority over its competitors' supplies.).
[18] *See* 2019 Annual Report at 7.
[19] 2019 Annual Report at 42.
[20] *Id.* at 12.
[21] *Id.* at 13.
[22] 2020 Investor Tech Talk, ("Modernizing print is also about evolving our business model from one that's highly reliant on supplies to a more balanced model[. . .] Our standard system['s] higher price reflects the fact that we want to actually make money on the hardware when we place the hardware in our standard systems, not counting on the annuity supplies.").

CLASS ACTION COMPLAINT                    8

40.     Intending to address HP's declining market share in HP InkJet Cartridges, HP developed a new strategy to bolster its critical revenue in Supplies (the "Playbook"); indeed, one of the Playbook's stated goals is to reduce HP's mix of "unprofitable" customers.[23]

41.     Plaintiff is informed and believes that HP also intended to use the Playbook to increase its market share in HP InkJet Cartridges by suppressing competition for HP InkJet Cartridges and limiting consumer choice in the aftermarket for HP Inkjet Cartridges.[24]

42.     HP categorizes the users of its printers in relation to the users' consumption of HP Original cartridges; customers are categorized as: (1) "loyal" (customers who regularly use HP Original cartridges), (2) "disloyal" (customers who occasionally use third-party cartridges), or (3) "non-loyal" or "non-HP" (customers who purchase an HP Printer but do not use or purchase HP Inkjet Cartridges from HP).[25]

43.     Plaintiff is informed and believes that HP developed the Playbook to reduce the number of "disloyal" and "non-HP" customers and increase the number of "loyal customers" to increase HP's market share in the aftermarket for HP InkJet Cartridges and bolster the critical Supplies revenue stream.

---

[23] *See* 2020 Strategic Plan at 10.
[24] *See* 2020 Strategic Plan at 10.
[25] ITALIAN COMPETITION AUTHORITY, *Document P28451* at ¶¶ 75-76, *available at* https://em.agcm.it/en/media/press-releases/2020/12/PS11144 (last visited Feb. 10, 2022) (translation provided by Google).

CLASS ACTION COMPLAINT                9

44.     To those ends, HP now repeatedly states that it offers customers two choices at the point of sale.[26] Potential HP printer purchasers may choose between: (a) using the "standard printing model" – wherein a consumer purchases an HP Printer and may choose whatever supplies that consumer desires in the aftermarket for HP Inkjet Cartridges, or (b) using the "End to End System" – wherein a customer agrees to use only HP Original Supplies by signing up for HP's subscription programs such as Instant Ink or HP+ programs.[27]

**Opportunity**
- ~25% of customers are not profitable: they don't buy HP supplies or they use imitation supplies
- By shifting more business to upfront, contractual, and optimized pricing models, HP has an opportunity to evolve print business profitability
- Strategy enabled by big data built on unique cloud infrastructure developed over past 3 years

**Customer choice**
- End to End System:
  Rewards loyal customers that use HP Printer and HP Supplies
- Flexible System:
  Customers that want choice of Supplies pay full value for Hardware

**Confidence**
- Customer research[1]: 8 of 10 customers believe End to End is a better value vs. the traditional model, 3 of 10 competition print customers switch preference from competition to HP End to End

**Focus on total system value**
- Customer choice with better value for loyal customers
- Increased Hardware Gross Margin
- Maximize system value

[28]

Under the "End to End System," the customer purchases an HP printer that functions only with supplies manufactured by HP – thus guaranteeing HP can derive profits from the consumer over the entire lifespan of the printer.  HP's stated preference is for consumers to move to the "End to End System" wherein the customer is both technologically and contractually obligated to

---

[26] *See* Paul Kunert, *HP to hike upfront price of printer hardware as ink biz growth runs dry*, THE REGISTER (Oct. 9, 2019), https://www.theregister.com/2019/10/09/hp_supplies/.
[27] *See* 2020 Investor Tech Talk.
[28] 2020 Strategic Plan at 10; *see also* Tuan Tran, *2019 SAM Presentation*, at 10, 15-17, INVESTORS - HP, https://s2.q4cdn.com/602190090/files/doc_downloads/2019/SAM-2019-Tuan-Print-FINAL.pdf (last visited Feb. 10, 2022).

purchase and use only HP Original cartridges.[29] HP confirmed that, if the desired mix of customers moved to the "End-to-End System" HP would achieve a "100% aftermarket share."[30]

45.     However, HP represents that customers who "want choice of Supplies" can use the "Flexible System."[31] Under this standard printer model the customer can, according to HP, choose between resupplying with HP Original cartridges or resupplying with third-party cartridges.

46.     Speaking for HP, the HP President of Imaging & Printing, Tuan Tran, stated at a 2019 Securities Analyst Meeting "that customers can pay for the full value of HP printers upfront, gaining the flexibility for supplies."[32] Mr. Tran stated choosing the standard printing model "is like buying an unlocked cellphone, and then choosing your own wireless carrier."[33]

47.     HP markets its own ink as the superior choice and states that, with the standard printing model, "customers can enjoy HP's superior printing hardware but obviously take risk if they choose alternative supplies."[34]

48.     Plaintiff and Class Members are among those customers who initially "want[ed] choice" and thus purchased a Class Printer, believing that their Class Printer purchases provided a "flexible choice." Plaintiff and Class Members paid a higher upfront cost for their Class Printers, as HP represented that the "standard printing model" allowed customers flexibility when choosing which supplies to use in their printers.

49.     In reality, HP's Playbook included tactics that HP knew would preclude customers from realizing that purchasing flexibility in the HP InkJet Cartridge aftermarket. HP does not reveal before, at, or after the point of sale that the "risk" in choosing third-party supplies is that HP will, at its discretion, send malicious firmware updates that disable third-party cartridges.

---

[29] *See* 2020 Investor Tech Talk.
[30] *See id.*
[31] *See* Paul Kunert, *HP to hike upfront price of printer hardware as ink biz growth runs dry*, The Register (Oct. 9, 2019), https://www.theregister.com/2019/10/09/hp_supplies/.
[32] *Id.*
[33] *Id.*
[34] *Id.*

### C.     HP's Unlawful "Playbook"

50.     According to HP's 2020 Strategic Plan, HP's Playbook includes, among other tactics, "authentication" procedures, "technology refreshes," IP enforcement,[35] and "driv[ing] preference for HP



supplies." [36]

[37]

51.     Plaintiff is informed and believes that the Playbook uses two independently unlawful methods at issue in this case: (1) installing technology within its products that covertly records and transmits data about customers' printing habits – including number of pages printed, amount of ink used, and type of cartridge installed (specifically, whether the cartridge is HP Original or third-party); and (2) sending malware to its customers' printers that causes printers equipped with competitors' supply cartridges to malfunction and/or disables those printers completely.

---

[35] HP has, for years, systematically removed competing cartridges from the aftermarket using the legal system. For example, in the Northern District of California, HP brought and voluntarily dismissed a lawsuit against Datel for allegedly misappropriating trade secrets concerning key codes. *Hewlett-Packard Co. v. Datel Holdings Ltd.*, No. 14-cv-02891-EJD (N.D. Cal. filed June 23, 2014) (voluntarily dismissed on Feb. 6, 2015). HP also brought and voluntarily dismissed a suit against Ninestar and Apex for making ink cartridge chips that allegedly infringed three HP patents. *Hewlett-Packard Co. v. Ninestar*, No. 14-cv- 04473-HSG (N.D. Cal. filed Oct. 6, 2014) (voluntarily dismissed on May 6, 2015).

[36] *See* 2020 Strategic Plan at 26. HP has acknowledged the effects that its so-called supplies "authentication" procedures can have on its market share in supplies (+5% market share).

[37] 2020 Strategic Plan at 26.

CLASS ACTION COMPLAINT            12

      1.     <u>HP's covertly records and transmits data from each of its printers without the consent or knowledge of its consumers.</u>

52.    HP openly maligns its customers that choose to use non-Original or third-party cartridges as "unprofitable." [38]



53.    Mr. Tran, speaking for HP at an "Investor Tech Talk," stated that 25% of HP's customers act unprofitably by purchasing third-party cartridges and that third-party cartridges are "bad for business."[40]

54.    HP is aware of the exact number of customers using third-party cartridges because, unbeknownst to consumers, HP covertly collects data on consumers' printing habits – including the type of cartridges printer owners use.

55.    Without Plaintiff's and Class Members' knowledge or consent, HP surreptitiously obtains information on the type of cartridges that Plaintiff and Class Members are using.

---

[38] 2020 Strategic Plan at 28.
[39] *See* 2020 Strategic Plan at 28.
[40] *See* 2020 HP Investor Tech Talk; *HP says imitation cartridges are "bad for business"* THE RECYCLER, https://www.therecycler.com/posts/hp-imitation-cartridges-bad-for-business/ (last visited Feb. 8, 2022).

CLASS ACTION COMPLAINT        13

56.     Plaintiff is informed and believes that unbeknownst to consumers, HP's "Installed Base"[41] of printers are instructed to record the printer's operating data and data related to the printer's installed cartridges (specifically whether the cartridges are HP Original or third-party).[42] This data is then transmitted back to HP, who collects and stores the data within its "Big Data" archive.[43]

57.     HP does not reveal this practice to consumers or printer owners, either before or at the point of sale, nor does HP obtain consent from those individuals.[44]

58.     Plaintiff is informed and believes that HP's collection and retention of this data from a consumer's printer is not necessary for the operation of the consumer's printer.[45] HP uses this Big Data archive to enable the formulation of its Playbook strategy; specifically for developing firmware updates aimed at limiting the use of third-party cartridges and determining the next models of printers to target for those malicious firmware updates.

59.     The Italian Competition Authority found that HP segmented its customers into the loyal, disloyal, and non-loyal/non-HP subclasses based on type of cartridge model those customers used and the associated usage data. HP analyzed the usage data of those customers and, based on that analysis, strategized which commercial actions to implement to "recover unfaithful customers" for each respective cartridge model.[46]

60.     Plaintiff is informed and believes that HP does the same in the United States geographic market; one such commercial action taken in the United States is "IB Renewal" or "Installed Base Renewal," which involves updating HP's Installed Base of printers using firmware updates; IB Renewal is the "main tool" to "[g]et back [disloyal] customers to original ink" and "convert [non-HP] customers to original ink."[47]

---

[41] Installed base refers to the number of units of a product or service currently in use.
[42] ITALIAN COMPETITION AUTHORITY, *Document P28451* at ¶ 145.
[43] *See* ITALIAN COMPETITION AUTHORITY, *Document P28451* at ¶¶ 144-146.
[44] *See* ITALIAN COMPETITION AUTHORITY, *Document P28451* at ¶¶ 144-146.
[45] *See id.* at ¶ 145.
[46] *See* ITALIAN COMPETITION AUTHORITY, *Document P28451* at ¶¶ 75 (discussing HP's quarterly presentations analyzing data from each of HP's customer categories and indicating initiatives to recover and maintain ink sales, including *IB Renewal*).
[47] *Id.* at ¶¶ 76-77.

61.     Plaintiff is informed and believes that HP's practice of IB Renewal includes strategically pushing malicious firmware updates to Class Printers that disable the Class Printers' functionality if a third-party cartridge is installed.

2.     <u>HP repeatedly uses malicious firmware updates to systematically disable printers from using third-party cartridges.</u>

62.     As stated above, HP states that it offers consumers an upfront "choice" between (a) using "the Flexible System," also known as the "standard printer model;" and (b) using HP's "End to End" system, such as enrolling in HP's Instant Ink or HP+ Printer programs – thus guaranteeing HP can derive profits from the consumer over the entire lifespan of the printer.

63.     HP's stated preference is for consumers to move to the "End to End" system wherein the customer is both technologically and contractually obligated to purchase only HP Original cartridges.[48]

64.     If customers shift to the "End to End" model, HP could reduce its mix of unprofitable customers. To that end, HP uses a variety of tactics to deceive consumers into believing that their Class Printer purchases provide a "flexible choice."

65.     In reality, HP periodically pushes out firmware[49] updates that act as malware which disables the Class Printers' unless an HP Original cartridge is installed ("malicious firmware updates").

66.     As stated above, for a cartridge to be compatible with a printer, both the hardware – *i.e.*, the physical form of the cartridge - and the software – *i.e.*, the code written onto the chips embedded in both devices – must align.

67.     HP's malicious firmware updates disable aspects of the Class Printers' functionality by altering the printers' code.

---

[48] *See* 2020 Investor Tech Talk.
[49] Firmware is defined as the set of software installed by the manufacturer on your device. *See also HP Blocks Users from Changing their Firmware Settings,* THE RECYCLER (Oct. 27, 2021), https://www.therecycler.com/posts/hp-blocks-users-from-changing-firmware-settings/ (detailing how HP blocked users from changing their firmware settings).

68.     This malware disables printing if third-party cartridges are installed or if the Class Printer
Owner attempts to install a third-party cartridge. This malware further instructs the Class Printer to
display a (false) error message. The false error messages state that the printer is experiencing a "supply
problem," "cartridge communication error," or "cartridge problem."



69.     After a malicious firmware update, overwhelmed consumers must either accept that their
Class Printers are useless or must purchase HP Original cartridges – joining the fold of "loyal" profitable
consumers, just as HP desires.

70.     HP's repeated malware transmissions affected almost every model of HP InkJet printers,
as well as the corresponding third-party cartridges that were in the printers or were already purchased by
Plaintiff and Class Members at the time the update was transmitted or activated.

71.     The malware caused damage to Plaintiff's and Class Members' printers. HP's conduct
was unilateral, unsolicited, misleading, and deceptive. HP did not seek consent from, advise, or explain
the malware or the update to Plaintiff and Class Members. HP simply transmitted the update. Plaintiff
and Class Members did not authorize HP to transmit the update or to cause damage to their printers.

72.     In addition, HP made misrepresentations and omissions of material fact regarding the
firmware updates. At the point of sale, HP omitted material facts concerning its well-conceived business
plan to periodically disallow competing supplies. After HP transmitted the updates, HP made false
statements to conceal its role and the nature of the update. HP caused a message to be displayed claiming
that the printer had a "Supply problem," "Cartridge Problem," or "Cartridge Communication Error"

when a competitor's supply cartridge was installed. HP did not attribute the problem to a firmware

update, malware transmission, or other conduct on its part.

3. <u>Numerous regulatory agencies and courts worldwide have found HP's conduct unlawful and anticompetitive, and HP implements the same strategies in the United States geographic market.</u>

73.    HP has faced regulatory and legal backlash abroad and in the United States for its

unlawful and anticompetitive practices in foreign countries and Plaintiff is informed and believes that

HP utilizes the same practices to deceive, defraud, and mislead consumers and suppress competition in

the United States.[50]

74.    For example, Italy's governmental regulator, the Italian Competition Authority ("ICA"),

fined HP €10 million for misleading and aggressive commercial practices. In a December 9, 2020 press

release, the ICA "found that the limitations on the use of non-original cartridges are not adequately

highlighted on the sales packages." In addition, the limitations on the use of non-original cartridges

are "renewed and modified through subsequent printer firmware updates [. . .] without properly

informing them of the consequences of these updates" when the firmware disseminated, on its website,

or when customers sought assistance.[51]

75.    The ICA also found HP obtains and records whether customers use HP Original or third-

party compatible cartridges and has created "Big Data" infrastructure using that covertly acquired data;

HP uses this "Big Data" infrastructure when formulating its commercial strategies and also uses this

information to deny assistance to third-party cartridge users.[52]

76.    The ICA's translated notice reads:

**COMMUNICATIONS   FOR   THE   PROTECTION   OF   THE CONSUMER**

---

[50] *See, e.g.*, HP 2021 10-Q at 39-42, *available at* https://s2.q4cdn.com/602190090/files/doc_financials/2021/q3/HP-7.31.21-10Q-(Q3)-(NG)-(1).pdf (last visited Mar. 3, 2022) (detailing ongoing litigation and regulatory matters worldwide related to HP's conduct described herein.).
[51] ICA Press Release, *available at* https://em.agcm.it/en/media/press-releases/2020/12/PS11144 (last visited Mar. 23, 2022).
[52] *See supra* pp. 14-15, discussing HP's use of "Big Data" to "drive [unprofitable consumers] to HP products."

CLASS ACTION COMPLAINT                              17

COMPANIES HP INC. AND HP ITALY S.R.L (CONGUINTELY HP)

1. have induced consumers and [small businesses] to purchase HP branded printers and to update the firmware installed on them, failing to inform them of the limitations therein regarding the use of non-original ink / toner cartridges and providing omissive and misleading information regarding quality of non-original ink refills, such as to lead one to believe that non-original cartridges cannot be used or have to be replaced due to deficiencies or defects in the latter, rather than due to the limitations introduced by specific instructions contained in the printer firmware ;

2. have given, through the firmware and without the knowledge of their customers, instructions according to which the printers record operating data – relating to the cartridges used, original or not – and send them to an archive that HP uses for the formulation of their business strategies and, for HP printers that have used non-genuine cartridges, have denied the warranty and refused to certify the causal link between the malfunction of the printer and the use of the legal guarantee of conformity by the vendors.

*Practice No. 1 was deemed incorrect pursuant to art. 20, 21 and 22 of the Consumer Code and practice no. 2 was deemed incorrect pursuant to art. 20, 24 and 25 of the Consumer Code.*[53]

77.     Additionally, in 2021, Amsterdam Court of Appeals ruled that HP acted unlawfully due to incorrect and inadequate information about the cause and solution of a blockade [firmware update] of private label cartridges implemented by HP worldwide in September 2016.[54] The Amsterdam Court of Appeal ruled that HP is liable for the damage suffered by participants of Stichting 123inkt private label customers.[55]

---

[53] *Italy Posts Notice on their Website,* THE RECYCLER, https://www.therecycler.com/posts/hp-italy-posts-notice-on-their-website/ (last visited Mar. 3, 2022).
[54] *See* 2021 10-Q at 39.
[55] *Netherlands Supreme Court Rejects Appeal,* THE RECYCLER, https://www.therecycler.com/posts/netherlands-supreme-court-rejects-appeal/ (last visited Mar. 3, 2022).

CLASS ACTION COMPLAINT                18

78.     Plaintiff is informed and believes that these are the same tactics employed in the United States geographic market to defraud and deceive Plaintiff and Class Members and unfairly reduce competition in the aftermarket for HP InkJet Cartridges.

**D.      HP Used the Playbook to Deceive and Defraud Class Printer Owners**

79.     HP's practice of covertly sending firmware updates to disable Class Printers using third-party cartridges ramped up during 2020.[56] In just 15 months HP sent the malware to over sixty (60) models of HP Inkjet printers, disabling those using third-party cartridges and/or permanently removing the capability to use third-party cartridges, including the Class Printers.[57]

80.     For example, on or about March 17, 2020, soon after the many states issued the first "lockdown" orders in the United States, HP issued a firmware update to printers associated with the HP 903XL and 953XL model cartridges, two of its most popular models.[58] The update "effectively shut down any printer that was using third-party inks."[59]

81.     Plaintiff is informed and believes that HP's decision to push out malicious firmware updates in the wake of the COVID-19 lockdowns was a strategy to "lock out aftermarket cartridges as business temporarily transitions to the home office."[60] While consumers adapted to work-from-home and struggled to adapt to life where a printer was now vital to working, child-rearing, and managing day-to-day administrative tasks, HP chose to capitalize on its captive consumer base by repeatedly rendering

---

[56] *See* https://www.therecycler.com/posts/hp-issues-the-most-firmware-updates-so-far/ (last visited Mar.13, 2022); THE RECYCLER, *HP Firmware In the Firing Line Again*,  https://www.therecycler.com/posts/hp-firmware-in-the-firing-line-again/ (last visited Mar. 13, 2022).
[57] THE RECYCLER, *HP Firmware In the Firing Line Again*,  https://www.therecycler.com/posts/hp-firmware-in-the-firing-line-again/ (last visited Mar. 13, 2022).
[58] Plaintiff is informed and believes this malicious firmware update affected, at least, HP OfficeJet 6950, 6962, OfficeJet Pro 6900, 6970, 7720, 7730, 7740, 8210, 8710, 8720, 8730, and 8740 printers.
[59] David Gibbons, *HP Continues to Target Workers at Home During Crisis,* RTM WORLD (Mar. 26, 2020), https://www.rtmworld.com/news/hp-continues-to-take-advantage-of-those-working-from-home/ (last visited Feb 10, 2022).
[60] David Gibbons, *HP Action Angers Printer Cartridge Association*, RTM WORLD (Mar. 26, 2020), https://www.rtmworld.com/news/hp-action-angers-printer-cartridge-association/.

CLASS ACTION COMPLAINT                    19

third-party cartridges useless.[61] Frustrated customers opined "With the problems we are facing in the world right now and SO MANY people having to work from home this latest strike at their customers could not have come at a worse time. Blood suckers . . . . they should be heavily fined for doing what they already know is illegal AND for price gouging at a time when many companies are going out of business due to the virus and yet most that can are volunteering to do things to help….but not HP."[62]

82.      Following immense consumer backlash, HP posted a now-deleted message on its website[63] and Vanessa Yanez, the Worldwide Head of Print Communications at HP, released a statement on LinkedIn: "Hello, I work for HP. This is a situation that shouldn't have happened and we are addressing it. If you have an HP OfficeJet or OfficeJet Pro printer and some of your non-HP branded cartridges are not working, please contact us here [https://bit.ly/2QBdxiA]."[64]

83.      Yet, despite its initial walk back, HP continued pushing malicious firmware updates to Class Printer owners throughout 2020, and, as Plaintiff is informed and believes, into 2021. [65]

84.      Plaintiff is informed and believes that HP sent malicious firmware updates to Class Printer owners in at least April, June,[66] July,[67] November, and December of 2020. [68]

85.      To date, HP's firmware updates have affected at least sixty (60) models of their InkJet printers.[69]

---

[61] *HP: More firmware pandemic issues*, THE RECYCLER (July 30, 2020), https://www.therecycler.com/posts/hp-firmware-update-blocks-aftermarket-cartridges/ (last visited Mar. 13, 2022).
[62] THE RECYCLER, *HP Firmware In the Firing Line Again*,  https://www.therecycler.com/posts/hp-firmware-in-the-firing-line-again/ (last visited Mar. 13, 2022).
[63] Though this webpage has been removed, it was formerly located at https://support.hp.com/us-en/document/c06599615.
[64] Similarly, this link no longer functions. *See* David Gibbons, *HP Continues to Target Workers at Home During Crisis*, RTM WORLD (Mar. 26, 2020), https://www.rtmworld.com/news/hp-continues-to-take-advantage-of-those-working-from-home/ (last visited Feb. 10, 2022).
[65] https://www.therecycler.com/posts/hp-issues-the-most-firmware-updates-so-far/
[66] Plaintiff is informed and believes that in June of 2020, HP released a firmware update that affected the DeskJet/Ink Advantage 26 series of printers that use 65/304/803/680/664/123 series inkjet cartridges.
[67] Plaintiff is informed and believes that in July of 2020, HP issued another firmware update to printers using HP 63/302 series cartridges, affecting the HP OfficeJet 5220, 5255, 5230, 5232, HP ENVY 5020, 5032 and HP DeskJet 2621 devices.
[68] THE RECYCLER, *HP Issues the Most Firmware Updates So Far*, https://www.therecycler.com/posts/hp-issues-the-most-firmware-updates-so-far/ (last visited Mar. 13, 2022).
[69] *See* THE RECYCLER, *HP Firmware Update Blocks Aftermarket Cartridges*, https://www.therecycler.com/posts/hp-firmware-update-blocks-aftermarket-cartridges/ (last visited Mar. 13, 2022); THE RECYCLER, *More Firmware Dark Arts from HP*, https://www.therecycler.com/posts/more-firmware-dark-arts-from-hp/ (last visited Mar. 13, 2022).

CLASS ACTION COMPLAINT                    20

### E.     HP's Continued Conduct

86.     HP has flatly refused to acknowledge the sole purpose of the malicious firmware updates is to block the use of third-party cartridges and that it covertly pulls data from each printer it sells - including every printer purchased by Plaintiff and Class Members.

87.     HP is fully aware that, at the point of sale, customers expect to be able to use third-party cartridges with their Class Printers and are later harmed by its practices. Even still, HP has provided no notice of its data collection practices and the purposes thereof or of the actual consequences of the malicious firmware updates and the damage those malicious firmware updates are certain to cause in Class Printers.

88.     Although HP is aware of the damage it causes to its customers, HP has engaged in the following acts and omissions:

> a)     Promoting and selling printers it knew would lose functionality at HP's command after malicious firmware updates;

> b)     Failing to disclose, prior to, at, and after the time of purchase any and all known material facts pertaining to capabilities of the Class Printers;

> c)     Promoting and selling Class Printers despite knowing that customers do not expect the Class Printer to suddenly malfunction or totally lose functionality;

> d)     Failing to disclose that the Class Printers would potentially lose functionality, and representing through advertising, product packaging, press releases, and other sources that the Class Printers possess particular qualities that were inconsistent with HP's actual knowledge of the product;

> e)     Sending repeated malware transmissions that caused a loss of functionality to its own customers;

> f)     Misinforming the customers about the cause of the damage;

> g)     Accessing the Class Printers and collecting, among other things, data on the type of cartridges that were being used to operate the devices without the users' knowledge or permission;

CLASS ACTION COMPLAINT                    21

h)      Using information covertly gathered about its customers to identify customers using third-party cartridges and targeting those customers for malicious firmware updates with the intent of increasing its market share in the HP InkJet Cartridge aftermarket.

i)      Sending malware updates that caused repeated instances of printer failure and never adequately informing consumers of the consequences of the firmware updates or of the cause of the damage to their Class Printers; and

j)      Minimizing the scope and severity of the problems with Class Printers, refusing to acknowledge that HP's conduct is part of a larger practice intended to "drive" customers to the use of HP Original cartridges, and failing to provide adequate relief to consumers.

## **CLASS PRINTERS**

89.      HP's malicious transmissions affected many models of HP printers, as well as the corresponding third-party cartridges that were in the printers or were already purchased by Plaintiff and Class Members at the time the updates were transmitted or activated.

90.      Subject to information learned in discovery, the Class Printers comprise all models of HP Printers that use ink supply cartridges, including HP DeskJet, ENVY, OfficeJet, and OfficeJet Pro printers and all-in-ones, in the following non-exhaustive list of HP printers and all-in-one products and product series:

| | | | |
|---|---|---|---|
| a. | DeskJet 2621; | m. | OfficeJet 6961; |
| b. | ENVY 5020; | n. | OfficeJet 6962; |
| c. | ENVY 5032; | o. | OfficeJet 6963; |
| d. | OfficeJet 5220; | p. | OfficeJet 6964; |
| e. | OfficeJet 5230; | q. | OfficeJet 6966; |
| f. | OfficeJet 5232; | r. | OfficeJet 7740; |
| g. | OfficeJet 5255; | s. | OfficeJet 8702; |
| h. | OfficeJet 6950; | t. | OfficeJet 8715; |
| i. | OfficeJet 6951; | u. | OfficeJet Pro 6960; |
| j. | OfficeJet 6954; | v. | OfficeJet Pro 6968; |
| k. | OfficeJet 6956; | w. | OfficeJet Pro 6970; |
| l. | OfficeJet 6958; | x. | OfficeJet Pro 6971; |

CLASS ACTION COMPLAINT                    22

| y. | OfficeJet Pro 6974; | rr. | OfficeJet Pro 8719; |
|----|---------------------|-----|---------------------|
| z. | OfficeJet Pro 6975; | ss. | OfficeJet Pro 8720; |
| aa. | OfficeJet Pro 6976; | tt. | OfficeJet Pro 8724; |
| bb. | OfficeJet Pro 6978; | uu. | OfficeJet Pro 8725; |
| cc. | OfficeJet Pro 6979; | vv. | OfficeJet Pro 8726; |
| dd. | OfficeJet Pro 7720; | ww. | OfficeJet Pro 8727; |
| ee. | OfficeJet Pro 7730; | xx. | OfficeJet Pro 8728; |
| ff. | OfficeJet Pro 7740; | yy. | OfficeJet Pro 8730; |
| gg. | OfficeJet Pro 8200; | zz. | OfficeJet Pro 8732M; |
| hh. | OfficeJet Pro 8210; | aaa. | OfficeJet Pro 8734; |
| ii. | OfficeJet Pro 8216; | bbb. | OfficeJet Pro 8735; |
| jj. | OfficeJet Pro 8218; | ccc. | OfficeJet Pro 8736; |
| kk. | OfficeJet Pro 8700; | ddd. | OfficeJet Pro 8740; |
| ll. | OfficeJet Pro 8710; | eee. | OfficeJet Pro 8743; |
| mm. | OfficeJet Pro 8714; | fff. | OfficeJet Pro 8744; |
| nn. | OfficeJet Pro 8715; | ggg. | OfficeJet Pro 8745; |
| oo. | OfficeJet Pro 8716; | hhh. | OfficeJet Pro 8746; |
| pp. | OfficeJet Pro 8717; | iii. | OfficeJet Pro 8747; |
| qq. | OfficeJet Pro 8718; | jjj. | OfficeJet Pro 9020 Wireless |

## **FACTS SPECIFIC TO HENRY SO**

91.     Henry So is a California resident living in Los Angeles, California.

92.     Henry So owns three Class Printers designed and manufactured by HP.

93.     For color printing, Mr. So purchased a new HP OfficeJet Pro 6978 All-in-One Printer (the "OfficeJet Pro 6978") for $79.99 plus tax on November 22, 2018, at Best Buy in City of Industry, California. The device's packaging contained an initial starter set of Model 902 HP Original cartridges.

94.     For printing photos, Mr. So purchased a new HP ENVY 7885 All-in-One Printer (the "ENVY 7885") for $229.99 at Best Buy in City of Industry, California on April 10, 2021.

95.     Mr. So rightfully believed his Class Printer purchases allowed him a "flexible choice" in supplies, as Mr. So purchased his two Class Printers to complement his HP OfficeJet 6962 All-in-One Printer that he had happily been using since 2016 with both HP Original Supplies as well as third-party cartridges.

96.     After his Class Printer purchases, Mr. So continued to purchase both HP Original Supplies from online retailers and third-party compatible cartridges from online and physical retailers for all three printers.

97.     For example, on July 25, 2021, Mr. So purchased a four-color pack of Office Depot Brand Tri-Color Ink Cartridge Replacements (Model 902XL) to use in the OfficeJet Pro 6978 from Office Depot in Whittier, California for $69.99 plus tax. Mr. So purchased the Office Depot cartridges because they were, at the time, truthfully advertised as compatible cartridges for the OfficeJet Pro 6978. The Office Depot cartridges were compatible when Mr. So installed them in his OfficeJet Pro 6978 and Mr. So was satisfied with the quality of the printer's output.

98.     In or around December 2020, HP sent out a malicious firmware update intended to affect printers using HP95X, 90X, 63 and 65 series of cartridges. The firmware update altered the code and data of the Class Printers and rendered the printers incompatible with third-party cartridges.

99.     On or around December 16, 2021; Mr. So's OfficeJet Pro 6978 stopped functioning and the printer indicated that it had a supply problem. Despite attempting to install several other cartridges he had available that contained adequate supplies of ink, Mr. So was forced to purchase new replacement HP Original cartridges for $63.99[70] from Costco Wholesale in City of Industry, California to continue using the OfficeJet Pro 6978.

100.    HP did not advise Henry So or the Class Members of the transmission.

101.    After the transmission, Henry So's fully functioning printer stopped working.

102.    As a consequence of HP's intentional conduct, Henry So's printer and supply cartridges were disabled. The Office Depot cartridges were useless. Henry So was effectively forced to purchase HP Original cartridges. Henry So was forced to replace his Model 902XL Office Depot cartridges with Model 902 HP Original cartridges for $63.99[71] from Costco Wholesale in City of Industry, California for use in the OfficeJet Pro 6978 to continue printing.

103.    The flexibility inherent in the "standard printing model" was an important factor in Plaintiff's decision to purchase his three Class Printers. Plaintiff would not have purchased his Class Printers, would have paid less for the Class Printers, or would have returned the Class Printers had he known HP intended to permanently deprive him of any meaningful choice in the HP InkJet Cartridge

---

[70] Mr. So purchased the Model 902 cartridges, rather than the 902XL, due to the inflated price of HP Original cartridges.
[71] Mr. So purchased the Model 902 cartridges, rather than the 902XL, due to the inflated price of HP Original cartridges.

aftermarket. If given the option, Henry So would continue to use his printers with reasonably priced third-party cartridges. Had Mr. So known that HP would intentionally transmit updates to the printer's software over the Internet that would render the printer incompatible with third-party cartridges, Mr. So would not have purchased the printer, would have paid less for the printers, or would have returned each printer within the buyer's remorse period.

## COMPLAINTS FROM HP CUSTOMERS

104.     Numerous other Class Members reported experiencing the same issue. Below are a few representative examples of (unedited) comments from message boards and internet forums about the problems:

- Also my HP officejet pro 8600 plus doesn't work anymore since I use not original hp ink cartridges. Until may I didn't have any problem to use the cheaper copies. I think it is really bad from HP to treat customers like that. Epson has alternativ printers, which use large inktank, maybe this will be the right time to change the printer…[72]

- I just recently bought a homebrand cartridge (INKTJET from PrintAbout- the 903XL in black) for my printer (HP Officejet pro 6960), because on the website it said that it would work on my printer. I couldn't buy a cartridge of the brand HP because it was urgent and I couldn't wait a week or two. When I put the cartridge inside, it stated (and still does) that I should remove it and reinstall it, which I did but it still won't work! I have literally done everything I could think of, such as cleaning, resetting etc but its still shows an error-sign. I have like an exam coming on and I can't go out to buy the right cartridge because of the COVID-19 virus, and I can't wait another week because its urgent.[73]

- I have an OfficeJet Pro 6978 that is relatively new and it will not accept 3rd party ink cartridges. When i put one in, despite the cartridges being labeled as "For use in HP" and "Compatible Replacement," when I put one in the machine I get a warning that says, "Remove and reinstall the indicated cartridge, making sure it is correctly installed."[74]

---

[72] https://borncity.com/win/2019/01/20/does-hp-blocks-3rd-party-ink-cartridges-again-on-its-printers-jan-2019/#comment-4727
[73] https://borncity.com/win/2019/01/20/does-hp-blocks-3rd-party-ink-cartridges-again-on-its-printers-jan-2019
[74] https://borncity.com/win/2019/01/20/does-hp-blocks-3rd-party-ink-cartridges-again-on-its-printers-jan-2019/#comment-4834

## **CLASS ACTION ALLEGATIONS**

105.     Plaintiff and Class Members are the owners and users of the Class Printers, which include HP's entire line of inkjet printers, or any HP Printer that uses ink cartridges.

106.     Pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), (b)(3), and (c)(4), Plaintiff seek certification of the following Classes defined as follows:

> **Device Owner Class.** All persons and entities in the United States who own a Class Printer or a similar HP InkJet Printer.
>
> **Damages Subclass**. All persons and entities in the United States who own a Class Printer that displayed a diagnostic error, such as "Supply Problem," "Cartridge Problem," "Cartridge Communication Error," or other similar error code, as a result of HP's transmission of a firmware update and other conduct described in this Complaint.
>
> **State Consumer Subclass.** All persons and entities residing in California and States with a similar consumer protection statute to Cal. Civ. Code 1770(a)(15), who own a Class Printer that displayed a diagnostic error, such as "Supply Problem," "Cartridge Problem," "Cartridge Communication Error," or other similar error code, as a result of HP's transmission of a firmware update.

107.     Excluded from the Classes are Defendant; any parent, affiliate, or subsidiary of Defendant; any entity in which Defendant has a controlling interest; Defendant's officers or directors; or any successor or assign of Defendant. Also excluded are any Judge or court personnel assigned to this case and members of their immediate families and staff.

108.     Plaintiff hereby reserves the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery before the Court determines whether class certification is warranted.

109.     The Fed. R. Civ. P. 23(a) elements of Numerosity, Commonality, Typicality, and Adequacy are all satisfied.

110.     **Numerosity. Fed. R. Civ. P. 23(a)(1).** Consistent with Rule 23(a)(1), the Class is so numerous that joinder of all members is impracticable. While Plaintiff does not know the exact number of Class Members, Plaintiff believes the Class and the Subclasses are comprised of millions of members. Class Members may be identified through objective means, including through Defendant's records.

Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, social media, and/or published notice.

111.   **Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirements, this action involves common questions of law and fact as to all Class Members, which predominate over any questions affecting individual Class Members. Such questions of law and fact common to the Class include, but are not limited to:

  a. Whether HP knowingly caused the transmission of a program, information, code, or command that caused damage to Class Printers and supply cartridges;

  b. Whether HP accessed the Class Printers without Plaintiff's and Class Members' knowledge or authorization, and obtained information about them;

  c. Whether HP's conduct constitutes prohibited conduct under the CFAA, Cal. Penal Code § 502(c), Cal. Bus. & Prof. Code § 17500, and the fraudulent, unfair, and unlawful prongs of Cal. Bus. and Prof. Code § 17200;

  d. The method of calculation and extent of damages for Plaintiff and the Class Members;

  e. Whether Plaintiff and the Class Members are entitled to restitution and, if so, in what amount; and

  f. Whether the Court should enter injunctive relief as requested in this complaint on behalf of the Class Members.

112.   **Typicality. Fed. R. Civ. P. 23(a)(3).** Consistent with Rule 23(a)(3), Plaintiff's claims are typical of the claims of the members of the Class. HP's common course of conduct in violation of law as alleged herein has caused Plaintiff and Class Members to sustain the same or similar injuries and damages. Plaintiff's claims are typical of the claims of other Class Members in that Plaintiff and the Class Members sustained damages arising out of Defendant's uniform wrongful conduct in the form of its malicious transmission and malfunction, and the error message that misrepresented the cause of the malfunction. Plaintiff's claims are thereby representative of and coextensive with the claims of the Class.

113.     **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiff is an adequate representative of the Class because Plaintiff is a member of the Class and is committed to pursuing this matter against Defendant to obtain relief for the Class. Plaintiff has no conflicts of interest with Class Members. Plaintiff's Counsel are competent and experienced in litigating consumer class actions, including product liability matters. Plaintiff intends to vigorously prosecute this case and will fairly and adequately protect the interests of the Class. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the other Class Members.

114.     **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to an individual Plaintiff may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiff and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

115.     **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

116.     Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues are set forth above.

117.    Finally, all members of the proposed Class are readily ascertainable. Defendant has access to information regarding the individuals who purchased its Class Printers. Using this information, Class Members can be identified and their contact information ascertained for the purpose of providing notice to the Class.

**COUNT I**
**Violations of the Computer Fraud and Abuse Act**
**18 U.S.C. § 1030(a)(5)(A), § 1030(a)(2)(C), and § 1030(a)(4)**
**(On Behalf of Plaintiff and the Device Owner Class)**

118.    Plaintiff incorporates Paragraphs 1 through 117 as if fully set forth here.

119.    18 U.S.C. § 1030(a)(5)(A) creates liability for whoever "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer."

120.    18 U.S.C. § 1030(a)(2)(C) creates liability for whoever "intentionally access a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer."

121.    18 U.S.C. § 1030(a)(4) prohibits knowingly and with intent to defraud, accessing a protected computer without authorization, or exceeding authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value.

122.    Under 18 U.S.C. § 1030(e)(1) of the CFAA, "computer" means any device for processing or storing data excluding an automated typewriter, portable handheld calculator, or other similar device. Similarly, under the CFAA, a protected computer is any computer which is used in or affecting interstate or foreign commerce or communication.

123.    Plaintiff's OfficeJet Pro 6978 and ENVY 7885 printers are protected computers under 18 U.S.C. § 1030(e)(2)(B). The Class Printers are also protected computers under 18 U.S.C. § 1030(e)(2)(B).

124.    Further, Plaintiff's and Class Members' third-party and HP Original cartridges are also protected computers under 18 U.S.C. § 1030(e)(2)(B).

125.    HP sent or caused to be sent a transmission of a program, information, code, or command in the form of a firmware update to the Class Printers.

126.    HP intentionally and knowingly sent or caused to be sent this transmission to the Class Printers.

127.    HP did not have permission or authorization from Plaintiff and the Class Members to make any modifications to the Class Printers.

128.    On a repeated basis, HP intentionally accessed Plaintiff's and Class Members' third-party and/or HP Original cartridges without their authorization or knowledge and obtained information from those computers.

129.    On a repeated basis, HP intentionally accessed Plaintiff's and Class Members' Class Printers without their authorization or knowledge and obtained information about usage data, printing habits, and cartridge type.

130.    Plaintiff is informed and believes that HP intentionally accessed Class Printers with the intent to obtain information for its Big Data infrastructure and enable HP to formulate and execute its Playbook, a fraudulent scheme intended to suppress competition in the aftermarket for HP InkJet Cartridges and unlawfully and unfairly deprive Plaintiff and Class Printer owners of any meaningful choice between HP Original supplies and third-party cartridges in that market.

131.    HP intentionally caused damage to the Class Printers. HP's transmission caused damage to the Class Printers by erasing, modifying, or altering the code that had enabled compatibility with third-party cartridges and disabling HP printers' ability to use third-party cartridges. HP caused damage by rendering Plaintiff's and Class Members' third-party cartridges useless. Class Printers were and are useless if they are equipped with third-party supplies and of diminished capabilities and value permanently as a result of the incompatibility going forward.

132.    HP did not have permission or authorization from Plaintiff and the Class Members to cause damage to the Class Printers.

133.    HP did not have permission or authorization from Plaintiff and the Class Members to obtain detailed usage information from their third-party cartridges.

134.    HP knowingly accessed and exfiltrated information from the Class Printers and any installed third-party cartridges with the intent to defraud consumers.

CLASS ACTION COMPLAINT                    30

135.    HP used the information it covertly collected from consumers to formulate and execute its "Playbook" – a fraudulent scheme intended to anticompetitively suppress competition in the aftermarket for HP InkJet Cartridges, compel Class Printer owners to purchase HP Original cartridges at inflated prices, and/or compel HP customers to switch to the more profitable subscription-based "End-to-End" systems like HP+ or Instant Ink.

136.    HP intentionally and knowingly sent or caused to be sent transmissions to the Class Printers with the intent to defraud consumers.

137.    HP's transmissions caused Class Printers to cease functioning if third-party or refilled cartridges were installed; these transmissions were intended to anticompetitively suppress competition in the aftermarket for HP InkJet Cartridges, compel Class Printer owners to purchase HP Original cartridges at inflated prices, and/or compel HP customers to switch to the more profitable subscription-based "End-to-End" systems like HP+ or Instant Ink.

138.    As a direct and proximate result of this misconduct, HP caused damage to Plaintiff and the owners of the Class Printers within the meaning of 18 U.S.C. § 1030(e)(8). The functioning of the printers was disrupted and a (false) error message was displayed on the printer screens.

139.    Further, as a direct and proximate result of this misconduct, HP caused damage to Plaintiff and the owners of the third-party cartridges within the meaning of 18 U.S.C. § 1030(e)(8). The third-party cartridges were accessed by HP and rendered useless by HP's conduct.

140.    Plaintiff and the Class Members suffered losses within the meaning of the CFAA, 18 U.S.C. § 1030(e)(11). Plaintiff's printers and cartridges were rendered inoperative, even though they still had remaining ink and were fully functioning prior to HP's firmware. Henry So had purchased Office Depot Branded Tri-Color Ink Cartridges for $69.99, which are now disabled. Mr. So was forced to purchase one or more HP Original cartridges as replacements. Plaintiff also has to pay to safely dispose of his unused and useless supplies.

141.    The firmware transmission also caused loss by decreasing the market value of the printers of Plaintiff and the Class generally, because the Class Printers are now lacking in certain functionality that they had previously. Henry So had invested significant amounts in purchasing his printers from HP, as he expected to use them for several years. Mr. So purchased his HP ENVY 7885 for $229.99

plus tax and his HP OfficeJet Pro 6978 for $79.99 plus tax. Prior to the firmware transmission, these printers had a low total operating cost because they could function with a variety of cartridges at low cost. However, after the firmware transmission, these printers could only function with high-priced HP Original cartridges.

142.    The firmware transmission also caused loss to Plaintiff and Class Members, as they had to expend money, time, and labor to investigate and repair and/or replace disabled Class Printers.

143.    Based on HP's violation of the CFAA, Plaintiff and Class Members seek damages, injunctive and other equitable relief, and all other relief provided for under the law.

### COUNT II
**Violation of the California Comprehensive Computer Data Access and Fraud Act,
Cal. Penal Code § 502,** *et seq.*

**(On Behalf of Plaintiff and the Device Owner Class)**

144.    Plaintiff incorporates Paragraphs 1 through 117 as if fully set forth here.

145.    California Penal Code § 502 imposes liability on a person who commits certain acts that constitute a public offense. Cal. Penal Code § 502(c).

146.    California Penal Code § 502 prohibits knowing and unauthorized access to computers, computer networks, and computer systems.

147.    The relevant provision of the CDAFA provides that a person is liable who:

(1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data.

(2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.

(3) Knowingly and without permission uses or causes to be used computer services.

(4) Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network.

---

CLASS ACTION COMPLAINT                    32

(5) Knowingly and without permission disrupts or causes the disruption of computer services or denies or causes the denial of computer services to an authorized user of a computer, computer system, or computer network.

Cal. Penal Code § 502(c)(1)-(5).

148.    Class Printers are "computers" and part of a "computer network" or "computer system" under this statute.

149.    HP's transmission is a "computer program or software" and "computer contaminant" under Cal. Penal Code §§ 502(b)(3) and (12).

150.    HP made "access" to the Class Printers under Cal. Penal Code § 502(b)(1) when it sent the malware transmission. HP caused the unauthorized access to all Class Printers from this jurisdiction and is thereby deemed to have personally accessed the Class Printers in this jurisdiction. Cal. Penal Code § 502(j).

151.    HP made "access" to the Class Printers under Cal. Penal Code § 502(b)(1) when it repeatedly recorded and transmitted to HP detailed usage data about the users' printing habits, including, without limitation, amount of ink used, type of cartridge, date/location/time of print. HP caused the unauthorized access to all Class Printers from this jurisdiction and is thereby deemed to have personally accessed the Class Printers in this jurisdiction. Cal. Penal Code § 502(j).

152.    HP knowingly sent the transmission and knowingly modified, damaged, destroyed, recorded, or transmitted information on the Class Printers without the intent or permission of Plaintiff and Class Members.

    a.    In violation of Cal. Penal Code § 502€(1), HP caused the Class Printers to display false error messages stating that there was a "supply problem," "cartridge problem," or "cartridge communication error." HP deployed these false error messages as a scheme to defraud, deceive, and extort Plaintiff and Class Members to purchase new HP Original cartridges from HP.

    b.    In violation of Cal. Penal Code § 502(c)(2), HP knowingly accessed and without permission took, copied, and made use of the data concerning the type of cartridges Plaintiff and Class Members were using to operate the Class Printers.

    c.    In violation of Cal. Penal Code § 502(c)(3), HP knowingly and without permission used or caused to be used the computer services of the Class Printers

by deploying the Class Printers for HP's own purpose to ascertain the type of printer cartridges were being used to operate the Class Printers and communicating that information back to HP.

d.  In violation of Cal. Penal Code § 502(c)(4), HP accessed and without authorization added, altered, damaged, deleted, or destroyed Class Printers' data, programs, or software.

e.  In violation of Cal. Penal Code § 502(c)(5), by disabling Class Printers, HP caused the disruption and denial of computer services to authorized users, such as Plaintiff and the Class Members.

153.    As a direct and proximate result of this misconduct, HP caused damage to the Class Printers and Plaintiff and the Class Members suffered losses. Henry So purchased a new HP ENVY 7885 for $229.99 at Best Buy, a new OfficeJet Pro 6978 for $79.99 at Best Buy and the 902XL Office Depot Cartridges for $69.99 at Office Depot. Henry So's Office Depot cartridges were rendered useless even though they had ink supply remaining at the time of HP's malicious firmware transmission, and Henry So was forced to purchase one or more HP Original cartridges as replacements because of HP's conduct. Plaintiff and Class Members also have to pay to safely dispose of their unused and useless supplies.

154.    HP's transmission caused damage and loss to Plaintiff and Class Members, including by disabling Class Printers, eliminating or impairing Plaintiff's and Class Members' use of Class Printers, and depriving Plaintiff and Class Members of the ability to use previously compatible third-party cartridges in their Class Printers. After the malicious firmware update, Henry So's Office Depot cartridges, purchased for $69.99 plus tax, were useless. Henry So purchased replacement HP Original cartridges from Costco Wholesale, but yet he remains unable to use third-party cartridges moving forward. Henry So's printer is of lesser value to him than it was previously. Plaintiff and Class Members also have to pay to safely dispose of their unused and useless supplies.

155.    The firmware transmission also caused loss by decreasing the market value of the printers of Plaintiff and the Class generally, because the Class Printers are now lacking in certain functionality that they had previously. Plaintiff and Class Members had invested significant amounts in purchasing their Class Printers from HP, as they expected to use them for several years. Henry So purchased a new HP ENVY 7885 for $229.99 and a new OfficeJet Pro 6978 for $79.99 at Best Buy. Prior to the

CLASS ACTION COMPLAINT                    34

firmware transmission, these printers had a low total operating cost because they could function with a variety of cartridges at low cost. However, after the firmware transmission, these printers could only function with high-priced HP Original cartridges.

156.    HP admits that it charges a higher upfront cost for the Class Printers because, unlike t"e "End to End" systems, printers using the "standard printing model" are not guaranteed to generate consistent supply revenue.

157.    The firmware transmission also caused loss to Plaintiff and Class Members in them being forced to expend money, time, and labor to investigate and repair the disabled Class Printers and dispose of the disabled cartridges, which Plaintiff and Class Members would not have purchased had they known HP was engaged in and would engage in the conduct alleged in this complaint.

158.    The CDAFA allows an individual who "suffers damage or loss by reason of a violation" of economic damages, injunctive and other equitable relief, as well as reasonable attorney's fees and costs, and all other relief provided for under the law.

159.    As an actual and proximate result of HP's conduct in violation of the California CDAFA, Plaintiffs and Class members have been damaged in an amount to be determined at trial. Under Penal Code §§ 502(e)(1) and (2), Plaintiffs and Class Members are entitled to compensatory damages, equitable relief, and reasonable attorneys' fees.

**COUNT III**
**Violations of the Unfair Competition Law – Unlawful Prong**
**Cal. Bus. & Prof. Code § 17200, *et seq*. ("UCL")**
**(On Behalf of Plaintiff and the Device Owner Class)**

160.    Plaintiff incorporates Paragraphs 1 through 117 as if fully set forth here.

161.    The UCL proscribes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

162.    The unlawful prong of California Business and Professions Code § 17200 prohibits any unlawful business practices.

163.    HP is a "business" as defined by § 17200.

164.    HP's conduct is unlawful, in violation of the UCL, because HP's conduct described in this complaint constitutes a violation of 18 U.S.C. §§ 1030(a)(5)(A), *et seq*. of the CFAA, Cal. Penal

Code § 502, California's False Advertising Law, and the California Consumers Legal Remedies Act ("CLRA") (as alleged in this Complaint) and all constitute separate and cumulative violations of the unlawful prong of § 17200.

165.    Plaintiff and Class Members have suffered damages in the form of lost money or property, ruined supply cartridges, and a devalued printer.

166.    Plaintiff is authorized to pursue a private right of action against HP under § 17204.

167.    Plaintiff and Class Members have no adequate remedy at law because of the ongoing uncertainty as to the functioning of the printer and whether HP will try to interfere with the functioning of their printers again. Plaintiff intends to purchase ink supplies from third parties at a lower cost for use with his Class Printers if the requested injunctive relief is granted.

168.    Plaintiff are entitled to and seek restitution and private as well as public injunctive relief under this section.

### COUNT IV
**Violations of the Unfair Competition Law – Unfair Prong**
**Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL")**
**(On Behalf of Plaintiff and the Device Owner Class)**

169.    Plaintiff incorporates Paragraphs 1 through 117 as if fully set forth herein.

170.    The UCL proscribes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

171.    The unfair prong of California's Unfair Competition Law prohibits unfair business practices that either offend an established public policy or that are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

172.    HP's repeatedly sent malware transmissions that caused a loss of functionality to its own customers, misinformed customers about the cause of the damage, and accessed the Class Printers and collected data on the type of cartridges used to operate the devices without the users' knowledge or permission. These practices offend an established public policy or are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

173.    HP also acted in an unethical, unscrupulous, outrageous, oppressive, and substantially injurious manner with respect to Plaintiff and the Class Members by engaging in unfair and

anticompetitive business practices that harmed consumer welfare. HP engaged in unfair business practices and acts in at least the following respects:

- HP promoted and sold Printers it knew contained hardware that could cause a loss of functionality of those Class Printers if HP transmitted a malicious firmware update;
- HP promoted and sold Class Printers with this hardware, despite knowing that customers do not expect the Class Printer to suddenly malfunction or totally lose functionality;
- HP promoted and sold Class Printers with this hardware, despite knowing that customers expected to use third-party cartridges in their Class Printers without such printers suddenly malfunctioning or totally losing functionality;
- HP failed to disclose that the Class Printers' contained hardware and software that could and would cause a loss of functionality at HP's command;
- HP represented through advertising, product packaging, press releases, and other sources that the Class Printers possess particular qualities that were inconsistent with HP's actual knowledge of the product;
- HP repeatedly sent malware transmissions that caused a loss of functionality to its own customers and misinformed the customers about the cause of the damage;
- HP accessed the Class Printers and collected usage data, including the type of cartridges used to operate the devices without the owners' knowledge or permission;
- HP used the information gathered about its customers to identify customers using third-party cartridges and targeted those customers for malicious firmware updates with the intent of increasing its market share in the HP InkJet Cartridge aftermarket; and
- HP minimized the scope and severity of the problems with Class Printers, refusing to acknowledge that HP's conduct is part of a larger practice intended to "drive" customers to the use of HP Original cartridges and/or "End to End" systems and failed to provide adequate relief to consumers.

These are practices and uniform courses of conduct that offend an established public policy or that are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

174. The utility of HP's transmissions and untrue statements are very low (as they are fraudulent and anti-competitive) and are vastly outweighed by the serious harm incurred by Plaintiff and Class Members.

175.    Any legitimate purpose or benefit of HP's conduct is substantially outweighed by the harm to consumers, competition, and the general public. There is no legitimate reason why HP should be allowed to secretly install firmware updates disabling previous capabilities without providing its customers a fully informed option to decline the update. There is no legitimate reason why HP should be allowed to obfuscate or deceive its customers about the reasons why their HP Class Printers no longer work with competitors' supplies and HP's role in bringing about the sudden decrease or cessation of functionality. If HP is truly conducting legitimate procedures, then it should inform the customer that the procedures will be conducted, or have been conducted, and not just make vague and misleading statements such as "supply problem," "cartridge problem," or cartridge communication error" that conceal HP's active and purposeful role in bringing about the problem or provide no advice to customers other than to buy HP Original cartridges at considerable premiums.

176.    Plaintiff was left with uncertainty as to the best course of action after seeing the false error messages. Plaintiff and Class Members had to either purchase a set of overpriced HP Original cartridges or throw away their HP printer and purchase a printer from another manufacturer. Unless the Court enjoins further unlawful acts by HP, Plaintiff and Class Members face uncertainty as to which of these choices would minimize their damage. Plaintiff So is unsure whether purchasing further third-party cartridges would result in further loss.

177.    Plaintiff and Class Members have incurred and continue to incur damages that are actual and recognized by statute in the form of a damaged printer and destroyed supply cartridges, and loss of money or property.

178.    Plaintiff and Class Members have no adequate remedy at law because of the ongoing uncertainty as to the functioning of the printer and whether HP will try to interfere with the functioning of their printers again. Henry So intends to purchase ink cartridges from third parties at a lower cost for use with his Class Printers if the requested injunctive relief is granted.

179.    Plaintiff and Class Members are entitled to and seek restitution and public as well as private injunctive relief under this section.

## COUNT V
**Violations of the Unfair Competition Law – Fraudulent Prong**
**Cal. Bus. & Prof. Code § 17200,** *et seq.* **("UCL")**
**(On Behalf of Plaintiff and the Device Owner Class)**

180.  Plaintiff incorporates Paragraphs 1 through 117 as if fully set forth here.

181.  The UCL proscribes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

182.  The fraudulent prong of the UCL prohibits business practices that are likely to deceive the public.

183.  HP's practice of sending a transmission that disabled functioning supply cartridges and rendered the Class Printers less valuable, and then misrepresenting the cause of the malfunction at the expense of its competitors, is a practice that is likely to deceive members of the public. HP also omitted, without the knowledge or permission of Plaintiff and Class members, that it was accessing the Class Printers and collecting data on the type of cartridges that were being used to operate the devices. HP's omissions of its business practices from potential printer purchasers is likely to deceive members of the public.

184.  HP's conduct is fraudulent in violation of the UCL because it is likely to deceive a reasonable consumer and:

- HP promoted and sold Printers it knew contained hardware that could cause a loss of functionality of those Class Printers if HP transmitted a malicious firmware update;
- HP promoted and sold Class Printers with this hardware, despite knowing that customers do not expect the Class Printer to suddenly malfunction or totally lose functionality;
- HP promoted and sold Class Printers with this hardware, despite knowing that customers expected to use third-party cartridges in their Class Printers without such printers suddenly malfunctioning or totally losing functionality;
- HP failed to disclose that the Class Printers' contained hardware and software that could and would cause a loss of functionality at HP's command;
- HP represented through advertising, product packaging, press releases, and other sources that the Class Printers possess particular qualities that were inconsistent with HP's actual knowledge of the product;
- HP repeatedly sent malware transmissions that caused a loss of functionality to its own customers and misinformed

the customers about the cause of the damage;

- HP accessed the Class Printers and collected usage data, including the type of cartridges used to operate the devices without the owners' knowledge or permission;

- HP used the information gathered about its customers to identify customers using third-party cartridges and targeted those customers for malicious firmware updates with the intent of increasing its market share in the HP InkJet Cartridge aftermarket; and

- HP minimized the scope and severity of the problems with Class Printers, refusing to acknowledge that HP's conduct is part of a larger practice intended to "drive" customers to the use of HP Original cartridges and/or "End to End" systems and failed to provide adequate relief to consumers.

185.    HP had ample means and opportunities to alert Plaintiff and Class Members of the true nature of its so-called firmware updates and intentions to disable certain functionalities within the Class Printers, including on in its advertisements of HP Printers; on the external packaging of HP Original cartridges; in its partners' online purchase portals; in the User Manuals; and as part of the standardized printer setup process. HP uniformly failed to disclose that it intended to permanently disable or damage printers utilizing third-party cartridges. Had HP disclosed this information, Plaintiff and Class Members would not have purchased a printer, would not have purchased a printer at the prices they did, or would have returned their printers during the respective buyer's remorse periods.

186.    HP was under a duty to disclose these practices because of its exclusive knowledge of its intent to disable third-party cartridge compatibility before selling the printers, because the omissions and misrepresentations resulted in material and unreasonable damage to Class Printers, and because customers were left uncertain about the best course of action with respect to their defective printers and now useless cartridges.

187.    Plaintiff and Class Members were unaware of HP's practices until they experienced printer malfunctions. Had HP disclosed the true nature of the firmware updates and data collection practices, Plaintiff and Class Members would have been aware of HP's practices and would not have purchased a Class Printer, would have paid substantially less for it, or would have returned it for a refund.

188.     Absent HP's unlawful, unfair and fraudulent conduct, Plaintiff and Class Members would not have purchased a Class Printer, would have paid substantially less for it, or would have returned it for a refund because HP omitted material information that it was under a duty to disclose and on which Plaintiff and the Class Members would have relied.

189.     Through its unlawful, unfair, and fraudulent conduct, HP acquired Plaintiff's money directly and as passed on by HP's authorized resellers (e.g., Best Buy, Amazon, and Staples). Plaintiff and Class Members suffered injury in fact, including lost money or property, as a result of HP's unlawful, unfair, and fraudulent conduct.

190.     Plaintiff and Class Members accordingly seek appropriate relief, including: (1) restitution under the UCL; and (2) such orders or judgments as may be necessary to enjoin HP from continuing its unfair, unlawful, and fraudulent practices. Plaintiff also respectfully seek reasonable attorneys' fees and costs under applicable law, including under California Code of Civil Procedure Section 1021.5.

## COUNT VI
### California False Advertising Law
### Cal. Bus. & Prof. Code § 17500

### (On Behalf of Plaintiff and the Device Owner Class)

191.     Plaintiff incorporate Paragraphs 1 through 117 as if fully set forth here.

192.     HP violated Cal. Bus. & Prof. Code § 17500 by using false and misleading statements, and material omissions, to promote the sale of HP's Original cartridges, HP ink subscription services, and/or new HP Printers and otherwise "concerning any circumstance or matter of fact connected with the proposed performance or disposition of services."

193.     Class Printers do not possess the level of quality or value that HP promised.

194.     HP made uniform representations and material omissions that communicated to Plaintiffs and Class Members that Class Printers were compatible with generic third-party ink cartridges and that Plaintiffs and Class Members could choose between HP Original cartridges or third-party cartridges, when that was not in fact true.

195.     HP made material omissions regarding its business practice of using the pretext of updating the firmware on its printers as a scheme to disrupt and disable third-party cartridges from its systems unfairly and coerce Plaintiff and Class Members to buy HP Original cartridges that are sold for

substantial and unjustified premiums. HP also omitted, without the knowledge or permission of Plaintiff and Class Members, that it was accessing the Class Printers and collecting data on the type of cartridges that were being used to operate the devices. Plaintiff and Class Members wanted to use their devices with reasonably priced third-party cartridges. Had Plaintiff and Class Members known that HP employed such tactics, they would not have purchased a Class Printer in the first place.

196.    HP made uniform representations and material omissions that communicated to Plaintiff and Class Members that there was an issue with their cartridges when that was false – just moments before HP sent the transmissions, there had been no problem. HP omitted the material fact that the purported supply problem was caused by HP's intentional transmission of malicious firmware designed to render third-party supplies incompatible with HP printers. HP had a duty to disclose the truthful cause of the problem.

197.    HP knew, or in the exercise of reasonable diligence should have known, that its representations and omissions were false and misleading at the time it made them. HP deliberately provided false representations and omissions to prevent customers from learning the intentional and unlawful design of HP's firmware updates and authentication procedures and further inducing its customers to purchase new supply cartridges from HP.

198.    HP had a duty to disclose that its conduct would constitute a material defect that relates to the central function of the printer—*i.e.*, its ability to use supply cartridges to print on an ongoing basis. HP also had a duty to disclose that it was collecting information on users without their knowledge or permission for its own purposes—*i.e.*, determining whether customers were using HP Original or competitors' third-party cartridges.

199.    HP's false and misleading advertising statements deceived the general public.

200.    As a direct and proximate result of HP's misleading and false advertising, Plaintiff and Class Members have suffered injury-in-fact and have lost money and property.

201.    Plaintiff and Class Members reasonably relied to their detriment on HP's material misrepresentations and omissions regarding its firmware updates and the purported error messages presented by HP.

202.     Plaintiff were left with uncertainty as to the best course of action after seeing the false error messages. Plaintiff and Class Members had to either purchase a set of overpriced HP Original cartridges or throw away their HP printer and purchase a printer from another manufacturer. Unless the Court enjoins further unlawful acts by HP, Plaintiff and Class Members face uncertainty as to which of these choices would minimize their damage. Henry So purchased a new HP Model 902X cartridges from Costco Wholesale, yet the problem persists. Of the moneys paid to partner retailers like Staples, BestBuy, CostCo, and Amazon, HP received the majority of those moneys.

203.     Plaintiff and Class Members seek to enjoin, under Bus. & Prof. Code § 17535, the violations described herein and to require HP to issue appropriate corrective disclosures and software fixes.

204.     HP's false advertising will continue to harm consumers unless and until it is enjoined.

205.     Plaintiff and Class Members therefore seek an order requiring HP to cease its false advertising and unlawful practices, provide full restitution of all monies HP derived from its false advertising, interest at the highest rate allowable by law, and for an award of reasonable attorney's fees and costs under applicable law, including Code of Civil Procedure § 1021.5.

## COUNT VII
### Fraud By Omission
### (On Behalf of Plaintiff and the Device Owner Class)

206.     Plaintiff incorporates Paragraphs 1 through 117 as if fully set forth here.

207.     Plaintiff brings this claim on behalf of the Device Owner Class under California law or, alternatively, the State Consumer Subclass(es) under the law of the state in which each respective Plaintiff purchased a Class Printer.

208.     HP failed to disclose material facts about the malicious firmware updates it pushed to its consumers. Further, HP failed to disclose material facts about the damaging functionality of the software installed within its printers. As alleged herein, HP knew that the printers could and would reject third-party cartridges upon firmware updates before the Plaintiff and Class Members purchased them. Further, HP was aware of numerous consumer complaints concerning compatibility issues with third-party cartridges, but never disclosed the true nature of the firmware updates to Plaintiff and Class Members.

209.   Because the technology that disables third-party cartridge compatibility is latent and unobservable until it is triggered by HP, Plaintiff and Class Members had no reasonable means of knowing that HP's representations concerning the Class Printers were incomplete, false, misleading, or that it had failed to disclose that it intended for third-party cartridges to permanently lose compatibility and the printers using those cartridges to entirely lose functionality. Plaintiff and Class Members did not and reasonably could not have discovered HP's deceit before they purchased the Class Printers or before the end of their buyer's remorse periods.

210.   HP made material omissions regarding its business practice of using the pretext of updating the firmware on its printers as a scheme to disable third-party supplies from its systems unfairly and coerce Plaintiff and Class members to buy HP Original cartridges that are sold for substantial and unjustified premiums. HP also omitted, without the knowledge or permission of Plaintiff and Class members, that it was accessing the Class Printers and collecting data on the type of cartridges that were being used to operate the devices. Plaintiff wanted to use their devices with reasonably priced third-party cartridges.  Had Plaintiff and Class members known that HP employed such tactics, they would not have purchased a Class Printer in the first place.

211.   HP made uniform representations and material omissions that communicated to Plaintiff and Class members that there was a "supply problem," "cartridge communication error," or "cartridge problem," when that was false – just moments before HP sent the transmission, there had been no problem. HP omitted the material fact that the purported problem was caused by HP's intentional transmission of firmware designed to render third-party supplies incompatible with HP printers.  HP had a duty to disclose the truthful cause of the problem.

212.   Had Plaintiff and Class Members known of HP's intention to disable third-party cartridges, they would not have purchased a Class Printer, would not have purchased it at the price they did, or would have returned it during their respective buyer's remorse periods. Plaintiff and Class Members reasonably believed HP's representations that the Class Printers provided consumers with a choice in the HP InkJet Cartridge aftermarket.

213.   HP had a duty to disclose the true nature of the firmware updates to Plaintiff, Class Members, and the public because HP's conduct with respect to the updates results in material and

unreasonable damage to the property of Plaintiff and Class Members and HP possessed exclusive knowledge of it.

214.    HP knew, or in the exercise of reasonable diligence should have known, that its representations and omissions were false and misleading at the time it made them. HP deliberately provided false representations and omissions to prevent customers from learning the intentional and unlawful design of HP's firmware updates and authentication procedures and further inducing its customers to purchase new supply cartridges from HP.

215.    HP had a duty to disclose that its conduct would constitute a material defect that relates to the central function of the printer—*i.e.*, its ability to use supply cartridges to print on an ongoing basis. HP also had a duty to disclose that it was collecting information on users without their knowledge or permission for its own purposes—*i.e.*, determining whether customers were using HP Original cartridges or its competitors' third-party cartridges.

216.    HP failed to disclose the true nature of the firmware updates to sell more HP Original cartridges at a premium price, prevent damage to its brand, and turn the so-called "compatibility issues" into an opportunity to direct HP's consumers to the more profitable "End to End" systems, such as HP+ or Instant Ink, wherein consumers are contractually or technologically obligated to purchase all of their supplies directly from HP.

217.    Plaintiff and other Class Printer owners were deprived of the "flexibility" to choose which cartridges to purchase in the HP InkJet Cartridge aftermarket. HP intentionally deprived Plaintiff and Class Printer owners of this choice.

218.    The facts about the firmware updates that HP suppressed and omitted were material to a reasonable objective consumer, and Plaintiff and Class Members were unaware of them until they experienced printer malfunctions. Had HP disclosed the true nature of the HP's anticompetitive scheme, Plaintiff and Class Members would have been aware of it, and would not have purchased a Class Printer, would have paid substantially less for it, or would have returned it for a refund.

219.    When deciding to purchase a Class Printer, Plaintiff and Class Members reasonably relied to their detriment upon HP's material omissions regarding the "flexibility" of Class Printers and

HP's intention to send malicious firmware updates that would disable functionality in their printers and damage the cartridges contained therein.

220.    Plaintiff and Class Members sustained damages as a direct and proximate result of HP's deceit and fraudulent concealment. Among other damage, Plaintiff and Class Members did not receive the value of the premium price they paid for the Class Printers.

221.    HP's fraudulent omission was malicious, oppressive, deliberate, intended to defraud Plaintiff and Class Members and enrich HP, and in reckless disregard of Plaintiff's and Class Members' rights, interests, and well-being. HP's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct, to be determined according to proof.

## COUNT VIII
### Violation of the California Consumers Legal Remedies Act ("CLRA")
### Cal. Civ. Code § 1770(a)(5), *et seq.*
### (On Behalf of Plaintiff and the State Consumer Subclass)

222.    Plaintiff incorporates Paragraphs 1 through 117 as if fully set forth here.

223.    The CLRA prohibits twenty-seven enumerated unfair business practices.

224.    Cal. Civ. Code § 1770(a)(5) of the CLRA prohibits representing that a seller's goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have.

225.    Cal. Civ. Code § 1770(a)(7) of the CLRA prohibits representing that its goods or services are of a particular standard, quality, or grade, if they are of another.

226.    Cal. Civ. Code § 1770(a)(9) of the CLRA prohibits advertising goods and services with the intent not to sell them as advertised.

227.    Cal. Civ. Code § 1770(a)(15) of the CLRA prohibits representing that a part, replacement, or repair service is needed when it is not.

228.    Defendant violated Cal. Civ. Code §§ 1770(a)(5) and 1770(a)(7) of the CLRA by representing that the Class Printers, sold at a higher price point because of the "flexible choice" available under the standard printing model, would function using both HP Original cartridges and third-

party cartridges when, at the point of sale, HP knew that the Class Printers would eventually only accept HP Original cartridges.

229.    Defendant violated Cal. Civ. Code § 1770(a)(9) of the CLRA when it advertised the Class Printers with the intent not to sell them as advertised.

230.    Defendant violated Cal. Civ. Code § 1770(a)(15) of the CLRA when it falsely told Plaintiff that his cartridges needed to be replaced, when it was actually HP's misconduct that caused the malfunction.

231.    As a result of this violation, on December 16, 2021, Plaintiff incurred damages in the form of having his Model 902XL Office Depot Brand Inks (worth $69.99 plus tax) ruined and being forced to spend $63.99 on new HP Original cartridges. Plaintiff's Class Printers also decreased in value as a result of not being able to function with third-party cartridges.

232.    As a result of this violation, Plaintiff and State Consumer Subclass Members have been deprived of the "flexible choice" HP represented would accompany the Class Printers. Had Plaintiff and State Subclass Members known that HP would intentionally disable the functionality of the Class Printers if third-party cartridges were installed, Plaintiff and State Subclass Members would have paid less for their Class Printers, would have returned the Class Printers during the respective buyer's remorse periods, or would not have purchased the Class Printers at all.

233.    Under Cal Civ. Code § 1781(a), any consumer who suffers damage as a result of a violation of this section may bring a class action on behalf of himself and all those similarly situated.

234.    On March 28, 2022, pursuant to Cal. Civ. Code § 1781(a)(1) and (2), Plaintiff sent notice of the violation and demand for correction to HP's Palo Alto headquarters via certified mail, return receipt requested.[75] Plaintiff reserves the right to amend his CLRA claim to seek damages as allowed by law.

235.    Plaintiff has no adequate remedy at law because he is currently unable to determine whether he will be able to use third-party cartridges in the future in any of his three Class Printers, and

---

[75] Exhibit 2.

he is uncertain whether HP will attempt to further interfere in his use of his printers. Plaintiff was left with uncertainty as to the best course of action after seeing the false error message. Plaintiff and State Subclass Members had to either purchase a set of overpriced HP Original cartridges or throw away their HP printer and purchase a printer from another manufacturer. Unless the Court enjoins further unlawful acts by HP, Plaintiff and State Subclass Members face uncertainty as to which of these choices would minimize their damage. Plaintiff needed to print right away, so he purchased a new set of the smaller Model 902 HP Original cartridges from Costco for $63.99. HP benefitted substantially from Plaintiff's purchase because HP received the majority of the revenue from the purchase.

236.    Therefore, Plaintiff and the Subclass are entitled to injunctive relief, actual damages, restitution, punitive damages, and all other relief that the court deems proper, including costs and attorney's fees, under Cal. Civ. Code § 1780.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the Classes defined above, respectfully requests that this Court:

A.    Determine that the claims alleged herein may maintained as a class action under Federal Rule of Civil Procedure 23, enter an order certifying the Classes defined above, and appointing Plaintiff's counsel as Class Counsel and Plaintiff as the representative of the Classes;

B.    Enter an order declaring that Defendant's actions, as set out above, violate the CFAA under 18 U.S.C. § 1030(a)(4), § 1030(a)(5)(A), and § 1030(a)(2)(C);

C.    Enter an order declaring that Defendant's actions, as set out above, violate California Penal Code § 502(c)(1)-(5);

D.    Enter an order declaring that Defendant's actions, as set out above, violate the fraudulent, unfair, and unlawful prongs of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200.

E.    Enter an order declaring that Defendant's actions, as set out above, violate Cal. Civ. Code § 1770(a)(5), *et seq*;

F. Grant an injunction requiring Defendant to cease the unlawful business practices described herein and otherwise protecting the interests of Plaintiff and the Classes, including requiring HP to reverse the effects of its malware transmissions insofar as they render once-compatible third-party cartridges obsolete, cease accessing the Class Printers to obtain customer data without permission, and prohibiting HP from sending such transmissions in the future without obtaining the fully informed prior consent of each printer owner;

G. Award all actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiff and Class Members are entitled;

H. Award pre-judgment and post-judgment interest as provided by law;

I. To the extent an adequate remedy at law does not exist: (a) grant appropriate equitable relief, including, without limitation, an order requiring HP to: (1) adequately disclose the true nature of its past malicious firmware updates; and (2) return to Plaintiff and Class Members all costs attributable to remedying or replacing Class Printer and third-party cartridges, including but not limited to economic losses from the purchase of replacement HP Original cartridges; (b) enjoin HP from pushing out future malicious firmware updates and/or using any of the other tactics described herein to prevent the use of third-party cartridges; and/or (c) grant such other equitable relief to which Plaintiff and Class Members are entitled.

J. Award reasonable attorneys' fees and costs as permitted by law; and

K. Grant such other and further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues triable as of right.

Date: April 14, 2022

Respectfully Submitted,

*/s/ Michael F. Ram*
Michael F. Ram

**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
Michael F. Ram (SBN 104805)
mram@forthepeople.com
Marie N. Appel (SBN 187483)
mappel@forthepeople.com
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Telephone: (415) 358-6913
Facsimile: (415) 358-6293

*Counsel for Plaintiff and the Putative Classes*