1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28`

MORGAN & MORGAN
COMPLEX LITIGATION GROUP
Michael F. Ram (SBN 104805)
mram@forthepeople.com
Marie N. Appel (SBN 187483)
mappel@forthepeople.com
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Telephone: (415) 358-6913
Facsimile: (415) 358-6293

*Counsel for Plaintiffs
and the Proposed Classes*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| HENRY SO, and DANIEL DYKE, individually and on behalf of all other similarly situated individuals,<br><br>Plaintiff,<br><br>v.<br><br>HP, INC. d/b/a HP COMPUTING AND PRINTING INC., a Delaware Corporation<br><br>Defendant. | No. 5:22-cv-02327-BLF<br><br>**SECOND AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Henry So and Daniel Dyke, individually and on behalf of all others similarly situated, submit this Second Amended Class Action Complaint against Defendant HP, Inc., d/b/a HP Printing and Computing Inc., ("HP") pursuant to the Court's July 17, 2023 Order Denying in Part and Granting in Part with Leave to Amend in Part and Without Leave to Amend in Part Motion to Dismiss First Amended Complaint (ECF 47), and makes the following allegations based on personal knowledge as to facts pertaining to their own experiences and on information and belief as to all others, and allege as follows against Defendant HP:

## **NATURE OF THE ACTION**

1.      HP wrongfully compels users of its printers to buy and use only HP ink and toner supplies ("HP Original Supplies") by transmitting firmware updates without authorization to HP printers over the Internet that lock out its competitors' refilled, new build, or remanufactured ink and toner supply cartridges ("third-party cartridges").[1] HP's firmware "updates" act as malware—adding, deleting or altering code, diminishing the capabilities of HP printers, and rendering third-party cartridges incompatible with HP printers ("malicious firmware updates"). As a result, and by HP's design, Plaintiffs and Class Members who reasonably and lawfully buy competitors' much less costly and equally effective supplies are left with useless printers and supply cartridges.

2.      HP has marketed and sold its standard HP printers as capable of printing using HP

---

[1] Third-party cartridges are produced and sold by a variety of HP's competitors. Third-party compatible cartridges can be categorized as: remanufactured, refilled, or new build compatibles.

Remanufactured and refilled cartridges are HP Original cartridges that are used and subsequently collected, inspected, cleaned, fit with new or reconditioned parts, refilled with ink or toner, and quality tested so that its capability to print has been restored. Some customers choose to refill their HP Original cartridges themselves.

New build compatible cartridges are new replacement cartridges that are made by a third-party in imitation of an Original cartridge with a shell, internal components and ink or toner that is not manufactured or distributed by the Original printer manufacturer.

SECOND AMENDED CLASS ACTION COMPLAINT                          No. 5:22-cv-02327-BLF

Original Supplies as well as refilled or third-party cartridges.[2]

3.      HP consistently markets its HP Original Supplies as superior to competing third-party cartridges. HP states that using HP Original Supplies "provides the best print quality."[3] HP also represents that HP Original Supplies are the "most reliable" and thus require "less service."[4] HP's public statements and advertisements imply that customers have a choice whether to use HP Original Supplies.

4.      HP consistently asserts that its printers provide HP's customers with a "flexible choice" between: (a) using the "standard printing model" – wherein a consumer purchases an HP Printer and may choose whatever supplies that consumer desires when resupplying that printer's ink, or (b) agreeing to use only HP Original Supplies by signing up for Instant Ink or HP+ programs and thus entering the "End to End System."

5.      When purchasing HP printers, Plaintiffs and Class Members reasonably believed that choosing the standard printing model would allow for the free exercise of a "flexible choice" – *i.e.,* choosing whether to purchase HP Original Supplies or third-party compatible cartridges.

6.      Even though HP sells ink and toner at substantial premiums over its competitors, HP is able to maintain and increase its market share in the aftermarket for HP compatible ink supplies ("HP InkJet Cartridges") only because HP's base class of printers contain microchips designed to cause printer malfunctions if third-party cartridges are installed once the printers receive a malware transmission via a malicious firmware update.

7.      HP's malware transmission is unannounced, automatic (on the part of printer owners), and unsolicited.  The firmware update, or the portion of the firmware update that renders third-party ink and toner incompatible with HP printers, serves no legitimate business purpose.  Even if other portions

---

[2] Plaintiffs are informed and believe that HP now attempts to disclose that its printers *may* not work with non-HP cartridges.  Plaintiffs do not know when HP made this change.

[3] *See e.g.,* HP, INC., Brief, *Original HP Toner Cartridges* dated December 2019 (detailing HP's messaging surrounding the benefits of choosing HP Original Supplies for HP's internal use and use with HP Partners.).

[4] *Id.*

of the transmission had some arguable security or quality benefit, the secretive, automatic, and misleading manner in which the firmware updates are carried out unlawfully deprives Plaintiffs and Class Members of the fully informed choice of either choosing to accept the firmware update and the represented benefits accompanying it, or to decline the update and receive the benefits of using the ink cartridges of their choice.

8.     As a result of HP's malware, HP printer owners who lawfully use significantly less expensive ink purchased from third parties are forced to buy HP Original cartridges, which HP sells at substantial premiums, or are deprived of the use of their printers until third parties can develop work arounds to again offer products in competition with HP.  HP harms competition because it deprives its printer users of the choice whether to purchase more expensive HP Original Supplies or the less expensive supplies of lawful competitors.

9.     In furtherance of the unlawful scheme, HP falsely represents and omits material facts regarding the reason for the sudden inability of its printers to function without HP Original cartridges. HP printers using third-party or refilled cartridges display error messages falsely stating that that the printer has a "supply problem" or "cartridge problem" or that the cartridges were not "communicating properly with the printer" and needed to be reinstalled or replaced. In fact, no such problem existed until HP intentionally caused one by sending malware to its printers to render third-party cartridges incompatible with its products.

10.     The incompatibility was not an unintended consequence of HP pursuing or implementing its legitimate business interests or conducting lawful quality assurance, security updates, or product improvements. The incompatibility was the point of the firmware updates, or the portion of the firmware updates that caused the incompatibility to prevent its printers from working with competitors' products. Third-party supplies are not collateral damage; they are the target.

11.     Due to the transmission and by HP's design, Plaintiffs' and Class Members' printers and ink cartridges were rendered incompatible and inoperable. Plaintiffs would not have purchased HP printers had they known HP was engaged in and would engage in such conduct. Had Plaintiffs and Class Members known that HP would surreptitiously render third-party cartridges incompatible, Plaintiffs and Class Members would not have purchased HP Printers or would have paid less for their printers. As a

direct and proximate result of HP's misconduct, Plaintiffs and Class Members sustained damages, including but not limited to the loss of the value of the InkJet cartridges they purchased that are no longer compatible with their printers, loss of time and effort to diagnose the damage to their printers and to determine what remedial measures to take, the need to purchase expensive HP Original cartridges, uncertainty in the functioning of their printers and supply cartridges, and future remedial costs.

12.     HP's malware transmission and false statements injured and will continue to injure its customers. HP's conduct is unlawful under federal and state laws prohibiting hacking and other computer crimes, as well as state statutory prohibitions against deceptive and unfair trade practices.

13.     Plaintiffs therefore seek actual, statutory, and exemplary damages, restitution, and an injunction requiring HP to reverse the effects of its malware transmissions insofar as they render once-compatible ink cartridges obsolete and prohibiting HP from sending such transmissions in the future without obtaining the fully informed consent of each printer owner.

## JURISDICTION AND VENUE

14.     This Court has federal subject matter jurisdiction over Plaintiffs' federal claims pursuant to 28 U.S.C. § 1331 as well as pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), as the amount in controversy exceeds the sum of $5,000,000, exclusive of interest and costs, there are more than 100 putative class members, and minimal diversity exists because many putative class members are citizens of a different state than Defendant.

15.     Additionally, the Court has original federal subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because it arises, at least in part, out of a question of federal law, the Computer Fraud and Abuse Act, 18 U.S.C. § 1030, *et seq.*

16.     Venue is proper in this District pursuant to 18 U.S.C. § 1965(a) and 28 U.S.C. § 1391(b)(2) because Defendant conducts its affairs in this District and a substantial part of the events giving rise to Plaintiffs' claims occurred in this District.

17.     This Court has personal jurisdiction over Defendant because its principal place of business is in California. Additionally, Defendant is subject to specific personal jurisdiction in this State because a substantial part of the events and conduct giving rise to Plaintiffs' and the Class claims occurred in this State.

**PARTIES**

18.      Plaintiff Daniel Dyke is a Florida citizen.  Plaintiff owns one HP OfficeJet Pro 6978 All-in-One Printer ("Class Printer") that he purchased new from HP.

19.      Plaintiff Henry So is a California citizen. Plaintiff So owns one Class Printer and two other HP brand printers. Plaintiff purchased these printers new in California from Best Buy and Amazon.

20.      Defendant HP is a California corporation with a principal place of business at Defendant HP, INC. d/b/a HP Computing and Printing Inc. is a Delaware corporation with its principal place of business located at 1501 Page Mill Road, Palo Alto, California, 94304. HP regularly conducts business throughout California and in this judicial district.

**COMMON FACTUAL ALLEGATIONS**

21.      HP is the "market leader" in the printing industry and is the number one seller of home and office, and graphics printers in the United States.[5]

22.      HP also sells associated HP-branded ink and toner cartridges for use in HP printers ("HP Original Supplies").

23.      Printing is one of the largest and most profitable of HP's business segments. In 2021, HP's total net revenue was $63,487,000,000.[6] Of that amount, HP's net revenue from printing was $20,128,000,000.[7] HP's operating profit margins on printing means that printing revenue accounts for

---

[5] *See* page 10, *Strategic & Financial Plan for Value Creation* (Feb. 24, 2020), attached as Ex. 99-2 to HP Inc. Form 8-K, submitted to Securities and Exchange Commission on Feb. 24, 2020, *available at* https://s2.q4cdn.com/602190090/files/doc_financials/2020/q1/Value-Creation-for-web-posting-(1).pdf (last visited Mar. 23, 2022) ("2020 Strategic Plan").

[6] HP earned $22,447,000,000 of that revenue in the United States. *See* HP INC. and Subsidiaries, Form 10-K - For the Fiscal Year ended October 31, 2021 https://s2.q4cdn.com/602190090/files/doc_financials/2021/q4/0302cd18-964e-4bee-b427-d313202a7dd9.pdf (last visited Mar. 22, 2022) ("2021 10-K").

[7] 2021 10-K at 69;

SECOND AMENDED CLASS ACTION COMPLAINT                          No. 5:22-cv-02327-BLF

50-60% of HP's operating profit, year over year.[8] Sales of HP Original Supplies, such as toner and ink, make up a large portion of HP's net revenue – in 2021, HP's revenue from Original Supplies alone was $12,632,000,000.[9]

24.     HP's printing segment generates this massive amount of revenue through sales in two separate markets: the Consumer and Commercial Hardware ("printer") foremarket and the HP InkJet Cartridge aftermarket.

25.     In the foremarket, HP's offers dozens of models of InkJet Printers, Copiers and All-in-Ones ("printers"). Each model of printer is only compatible with the associated model of ink or toner cartridge.

26.     For a cartridge to be compatible with a printer, both the hardware – *i.e.*, the physical form of the cartridge – and the software – *i.e.*, the code written onto the chips embedded in both devices – must align. For example, the HP OfficeJet Pro 6978 All-in-One Printer will only print if a compatible cartridge model – the Model 902 or 902XL cartridges – is installed.

27.     Unlike the fixed and upfront cost of a printer, the ink and toner cartridges used in printers are consumable and thus must be replenished periodically. Once a consumer purchases a printer,[10] that consumer must also purchase compatible cartridges to continue using that printer. Thus, the final price of a printer is difficult to estimate at the point of sale.

28.     The consumer purchases those compatible cartridges in the aftermarket for ink and toner.

---

[8] 2021 10-K at 69. *See* 2020 Q4 Earnings Presentation at 8, *available at* https://s2.q4cdn.com/602190090/files/doc_events/2020/Q42020/Q420-HP-Inc.-Earnings-Presentation-FINAL.pdf (last visited Jan. 31, 2022).

[9] 2021 10-K at 69. HP's net revenue from supplies (e.g., toner and ink) alone in 2019 was $12.9 billion. Consistent with its razor and blades model, its net revenues from hardware (*e.g.*, printers, among others) came to $7.1 billion in 2019.

[10] Most printers come with an initial "Startup" supply cartridges, typically with reduced printing capacity, that enable the customer to setup the printer and print a limited number of pages before a resupply is needed.

There, the consumer can choose whether to purchase new cartridges from the printer manufacturer or to purchase a compatible cartridge from a third-party.

29.     Thus, once a customer purchases an InkJet HP printer in the printer foremarket, that customer must purchase the affiliated cartridge models of HP InkJet Cartridges in the aftermarket.

### A.     HP's Standard Business Model

30.     `Within its printing segment, HP has traditionally employed a "razor and blades" business model, where the bulk of its profit is derived from its sales of consumable supplies (like ink and toner) instead of from the sales of HP printers themselves.[11]

31.     For companies employing a "razor and blades" business model for printers, most revenues and profits come from consumers repeatedly returning to purchase the necessary cartridges.

32.     HP printers were traditionally sold at a substantial discount with the intent on profiting on the sales of consumable supplies like toner and ink over the lifetime of the printer.[12] Because HP's profit margin on the initial printer sale is much lower than that of its subsequent ink sales, HP depended on recurring sales of its extremely high-priced HP Original Supplies as the lifeblood of its business.[13]

33.     HP's Original Supplies are so excessively priced that commentators have remarked that the price per ounce of HP's ink and toner range between the prices of silver and gold (at $4,731 per

---

[11] Anirudh Dhebar, "Innovating Around the Classic Razor-And-Blades Pricing Model" Babson College, April 2017. https://www.babson.edu/academics/executive-education/babson-insight/strategy-and-innovation/razor-and-blades-pricing-model/# (last visited Mar. 22, 2022).

[12] *See, e.g.*, *HP Investor Tech Talk Transcript,* SEEKING ALPHA (Dec. 3, 2020), https://seekingalpha.com/article/4392889-hp-inc-hpq-hp-investor-tech-talk-continuing-prints-evolution-launch-of-hp-transcript ("2020 Investor Tech Talk"); *id.* ("[W]e lose money about 25% of our customers. This is due to the fact that we invest money upfront in placing hardware, and we don't make that money back over the life of the product.").

[13] *See* 2019 10K, HP INC., at 7, https://s2.q4cdn.com/602190090/files/doc_financials/2019/ar/hp-inc_10-ka-(1).pdf (last visited Feb. 7, 2022) ("2019 Annual Report").

---

SECOND AMENDED CLASS ACTION COMPLAINT                          No. 5:22-cv-02327-BLF

gallon).[14]

34.     The critical component of a successful razor and blades business model is that the market for the replacement consumable(s) must be closed to competitors.[15] If consumers can purchase "blades" from anyone else, the model fails, as it cuts off the revenue stream generated from the exclusive sale of replacement consumables, or, at the very least, renders the aftermarket for replacement consumables substantially more competitive, driving prices down.[16]

35.     HP acknowledges that for some consumers, non-original inkjet cartridges ("third-party cartridges") are sufficient to meet its customers' printing needs. Third-party cartridges are between twenty-five to seventy-five percent (25-75%) less expensive than HP Original cartridges.[17]

36.     HP competes with sellers of third-party cartridges in the aftermarket for HP InkJet Cartridges.[18] Customers in that market substitute between HP Original cartridges and third-party cartridges for use in their HP Printers.

37.     As a result, HP fears competition in its "Printing Supply Business" – the HP InkJet Cartridge aftermarket – from what it refers to as "independent suppliers" who offer "non-original supplies (including imitation, refill or remanufactured alternatives)" that are "often available for lower

---

[14] *See* Eduardo Porter, "Why Printer Ink Is the Other 'Black Gold.'" ALL THINGS CONSIDERED, NPR, May 24, 2012, https://www.npr.org/2012/05/24/153634897/why-printer-ink-is-the-other-black-gold (last visited Mar. 7, 2020).

[15] *See* Dhebar, *Razor-and-Blades*, *supra* note 10.

[16] *Id.*

[17] *See, e.g.*, Complaint at 4, *Hewlett-Packard Co. v. LD Products, Inc.*, No. 5-cv-00494 (N.D. Cal. filed Feb. 4, 2013) (describing the aftermarket for HP InkJet Cartridges and stating that third-party cartridges offered by HP's competitors in that aftermarket are twenty-five to seventy-five percent less expensive than HP Original cartridges.).

[18] *See, e.g.*, *id.*; ex. 1 (describing HP's advertising that touts HP Original Supplies' superiority over its competitors' supplies.).

prices."[19]

38.     These competitors present a risk to HP's critical Supplies revenue, and HP's "[n]et revenue for Supplies [in 2019] decreased 4.8% as compared to the prior-year period, primarily due to demand weakness."[20]

39.     HP's public filings and internal investor presentations further indicate that competitors in the HP InkJet Cartridge aftermarket have continually eaten into HP's market share for HP InkJet Cartridges. HP previously warned investors that "[f]inancial performance could also decline due to increased competition from . . . non-original supplies"[21] and "our supplies business has recently experienced declining revenues due to declines in market share, installed base and usage, and increased customer pricing sensitivity."[22]

**B.     HP's New Strategy to Monopolize the HP InkJet Cartridge Aftermarket**

40.     In recent years, HP has "modernized" its business strategy in printing – HP charges a higher upfront price for the printer hardware if a customer chooses the flexibility of the "standard printing model" and offers lower prices for customers who agree to use the "End to End" systems.[23]

41.     Intending to address HP's declining market share in HP InkJet Cartridges, HP developed a new strategy to bolster its critical revenue in Supplies (the "Playbook"); indeed, one of the Playbook's stated goals is to reduce HP's mix of "unprofitable" customers.[24]

42.     Plaintiffs are informed and believe that HP also intended to use the Playbook to

---

[19] *See* 2019 Annual Report at 7.

[20] 2019 Annual Report at 42.

[21] *Id.* at 12.

[22] *Id.* at 13.

[23] 2020 Investor Tech Talk, ("Modernizing print is also about evolving our business model from one that's highly reliant on supplies to a more balanced model[ . . .] Our standard system['s] higher price reflects the fact that we want to actually make money on the hardware when we place the hardware in our standard systems, not counting on the annuity supplies.").

[24] *See* 2020 Strategic Plan at 10.

SECOND AMENDED CLASS ACTION COMPLAINT                         No. 5:22-cv-02327-BLF

increase its market share in HP InkJet Cartridges by suppressing competition for HP InkJet Cartridges and limiting consumer choice in the aftermarket for HP Inkjet Cartridges.[25]

43.     HP categorizes the users of its printers in relation to the users' consumption of HP Original cartridges; customers are categorized as: (1) "loyal" (customers who regularly use HP Original cartridges), (2) "disloyal" (customers who occasionally use third-party cartridges), or (3) "non-loyal" or "non-HP" (customers who purchase an HP Printer but do not use or purchase HP Inkjet Cartridges from HP).[26]

44.     Plaintiffs are informed and believe that HP developed the Playbook to reduce the number of "disloyal" and "non-HP" customers and increase the number of "loyal customers" to increase HP's market share in the aftermarket for HP InkJet Cartridges and bolster the critical Supplies revenue stream.

45.     To those ends, HP now repeatedly states that it offers customers two choices at the point of sale.[27] Potential HP printer purchasers may choose between: (a) using the "standard printing model" – wherein a consumer purchases an HP Printer and may choose whatever supplies that consumer desires in the aftermarket for HP Inkjet Cartridges, or (b) using the "End to End System" – wherein a customer agrees to use only HP Original Supplies by signing up for HP's subscription programs such as Instant Ink or HP+ programs.[28]

---

[25] *See* 2020 Strategic Plan at 10.

[26] ITALIAN COMPETITION AUTHORITY, *Document P28451* at ¶¶ 75-76, *available at* https://em.agcm.it/en/media/press-releases/2020/12/PS11144 (last visited Feb. 10, 2022) (translation provided by Google).

[27] *See* Paul Kunert, *HP to hike upfront price of printer hardware as ink biz growth runs dry*, THE REGISTER (Oct. 9, 2019), https://www.theregister.com/2019/10/09/hp_supplies/.

[28] *See* 2020 Investor Tech Talk.

**Opportunity**
- ~25% of customers are not profitable: they don't buy HP supplies or they use imitation supplies
- By shifting more business to upfront, contractual, and optimized pricing models, HP has an opportunity to evolve print business profitability
- Strategy enabled by big data built on unique cloud infrastructure developed over past 3 years

**Customer choice**
- End to End System: Rewards loyal customers that use HP Printer and HP Supplies
- Flexible System: Customers that want choice of Supplies pay full value for Hardware

**Confidence**
- Customer research[1]: 8 of 10 customers believe End to End is a better value vs. the traditional model, 3 of 10 competition print customers switch preference from competition to HP End to End

**Focus on total system value**
- Customer choice with better value for loyal customers
- Increased Hardware Gross Margin
- Maximize system value

29

Under the "End to End System," the customer purchases an HP printer that functions only with supplies manufactured by HP – thus guaranteeing HP can derive profits from the consumer over the entire lifespan of the printer.  HP's stated preference is for consumers to move to the "End to End System" wherein the customer is both technologically and contractually obligated to purchase and use only HP Original cartridges.[30] HP confirmed that, if the desired mix of customers moved to the "End-to-End System" HP would achieve a "100% aftermarket share."[31]

46.     However, HP represents that customers who "want choice of Supplies" can use the "Flexible System."[32] Under this standard printer model the customer can, according to HP, choose between resupplying with HP Original cartridges or resupplying with third-party cartridges.

47.     Speaking for HP, the HP President of Imaging & Printing, Tuan Tran, stated at a 2019

---

[29] 2020 Strategic Plan at 10; *see also* Tuan Tran, *2019 SAM Presentation*, at 10, 15-17, INVESTORS - HP, https://s2.q4cdn.com/602190090/files/doc_downloads/2019/SAM-2019-Tuan-Print-FINAL.pdf (last visited Feb. 10, 2022).

[30] *See* 2020 Investor Tech Talk.

[31] *See id.*

[32]*See* Paul Kunert, *HP to hike upfront price of printer hardware as ink biz growth runs dry*, THE REGISTER (Oct. 9, 2019), https://www.theregister.com/2019/10/09/hp_supplies/.

SECOND AMENDED CLASS ACTION COMPLAINT                    No. 5:22-cv-02327-BLF

Securities Analyst Meeting "that customers can pay for the full value of HP printers upfront, gaining the flexibility for supplies."[33] Mr. Tran stated choosing the standard printing model "is like buying an unlocked cellphone, and then choosing your own wireless carrier." [34]

48.     HP markets its own ink as the superior choice and states that, with the standard printing model, "customers can enjoy HP's superior printing hardware but obviously take risk if they choose alternative supplies."[35]

49.     Plaintiffs and Class Members are among those customers who initially "want[ed] choice" and thus purchased a Class Printer, believing that their Class Printer purchases provided a "flexible choice" in that they could work with HP branded, as well as third party, ink cartridges.  Plaintiffs and Class Members paid a higher upfront cost for their Class Printers, as HP represented that the "standard printing model" allowed customers flexibility when choosing which supplies to use in their printers.

50.     In reality, HP's Playbook included tactics that HP knew would preclude customers from realizing that purchasing flexibility in the HP InkJet Cartridge aftermarket. HP does not reveal before, at, or after the point of sale that the "risk" in choosing third-party supplies is that HP will, at its discretion, send malicious firmware updates that disable third-party cartridges.

### C.     HP's Unlawful "Playbook"

51.     According to HP's 2020 Strategic Plan, HP's Playbook includes, among other tactics, "authentication" procedures, "technology refreshes," IP enforcement,[36] and "driv[ing] preference for HP

---

[33] *Id.*

[34] *Id.*

[35] *Id.*

[36] HP has, for years, systematically removed competing cartridges from the aftermarket using the legal system. For example, in the Northern District of California, HP brought and voluntarily dismissed a lawsuit against Datel for allegedly misappropriating trade secrets concerning key codes. *Hewlett-Packard Co. v. Datel Holdings Ltd.*, No. 14-cv-02891-EJD (N.D. Cal. filed June 23, 2014) (voluntarily dismissed on Feb. 6, 2015). HP also brought and voluntarily dismissed a suit against Ninestar and Apex

---

supplies." [37]



HP SUCCESS IN
INK MARKET SHARE

+5pts

FY12          FY15          FY19

Successful INK actions
– Technology refreshes        – IP enforcement
– Authentication              – Drive preference for
– Instant Ink acceleration      HP supplies

EXECUTING PLAYBOOK
IN TONER

New mechanical & toner formulation

Toner authentication

Contractual expansion

IP enforcement

Drive preference for HP supplies

*hp*

38

Plaintiffs are informed and believe that the Playbook uses two independently unlawful methods at issue in this case: (1) installing technology within its products that covertly records and transmits data about customers' printing habits – including number of pages printed, amount of ink used, and type of cartridge installed (specifically, whether the cartridge is HP Original or third-party); and (2) sending malware to its customers' printers that causes printers equipped with competitors' supply cartridges to malfunction and/or disables those printers completely.

---

for making ink cartridge chips that allegedly infringed three HP patents. *Hewlett-Packard Co. v. Ninestar*, No. 14-cv- 04473-HSG (N.D. Cal. filed Oct. 6, 2014) (voluntarily dismissed on May 6, 2015).

[37] *See* 2020 Strategic Plan at 26. HP has acknowledged the effects that its so-called supplies "authentication" procedures can have on its market share in supplies (+5% market share).

[38] 2020 Strategic Plan at 26.

1.   <u>HP covertly records and transmits data from each of its printers without the consent or knowledge of consumers.</u>

52.   HP openly maligns its customers that choose to use non-Original or third-party cartridges as "unprofitable." [39]



40

53.   Mr. Tran, speaking for HP at an "Investor Tech Talk," stated that 25% of HP's customers act unprofitably by purchasing third-party cartridges and that third-party cartridges are "bad for business."[41]

54.   HP is aware of the exact number of customers using third-party cartridges because, unbeknownst to consumers, HP covertly collects data on consumers' printing habits – including the type of cartridges printer owners use.

---

[39] 2020 Strategic Plan at 28.

[40] 2020 Strategic Plan at 28.

[41] *See* 2020 HP Investor Tech Talk; *HP says imitation cartridges are "bad for business"* THE RECYCLER, https://www.therecycler.com/posts/hp-imitation-cartridges-bad-for-business/ (last visited Feb. 8, 2022).

55.     Without Plaintiffs' and Class Members' knowledge or consent, HP surreptitiously collects information on the type of cartridges that Plaintiffs and Class Members are using.

56.     Plaintiffs are informed and believe that unbeknownst to consumers, HP's "Installed Base"[42] of printers are instructed to record the printer's operating data and data related to the printer's installed cartridges (specifically whether the cartridges are HP Original or third-party).[43] This data is then transmitted back to HP, who collects and stores the data within its "Big Data" archive.[44]

57.     HP does not reveal this practice to consumers or printer owners, either before or at the point of sale, nor does HP obtain consent from those individuals.[45]

58.     Plaintiffs are informed and believe that HP's collection and retention of this data from a consumer's printer is not necessary for the operation of the consumer's printer.[46] HP uses this Big Data archive to enable the formulation of its Playbook strategy; specifically for developing firmware updates aimed at limiting the use of third-party cartridges and determining the next models of printers to target for those malicious firmware updates.

59.     The Italian Competition Authority found that HP segmented its customers into the loyal, disloyal, and non-loyal/non-HP subclasses based on type of cartridge model those customers used and the associated usage data. HP analyzed the usage data of those customers and, based on that analysis, strategized which commercial actions to implement to "recover unfaithful customers" for each respective cartridge model.[47]

60.     Plaintiffs are informed and believe that HP does the same in the United States geographic market; one such commercial action taken in the United States is "IB Renewal" or "Installed Base

---

[42] Installed base refers to the number of units of a product or service currently in use.

[43] ITALIAN COMPETITION AUTHORITY, *Document P28451* at ¶ 145.

[44] *See id.* at ¶¶ 144-146.

[45] *See id.* at ¶¶ 144-146.

[46] *See id.* at ¶ 145.

[47] *See id.* at ¶ 75 (discussing HP's quarterly presentations analyzing data from each of HP's customer categories and indicating initiatives to recover and maintain ink sales, including *IB Renewal*).

Renewal," which involves updating HP's Installed Base of printers using firmware updates; IB Renewal is the "main tool" to "[g]et back [disloyal] customers to original ink" and "convert [non-HP] customers to original ink."[48]

61.    Plaintiffs are informed and believe that HP's practice of IB Renewal includes strategically pushing malicious firmware updates to Class Printers that disable the Class Printers' functionality if a third-party cartridge is installed.

2.    HP repeatedly uses malicious firmware updates to systematically disable printers from using third-party cartridges.

62.    As stated above, HP states that it offers consumers an upfront "choice" between (a) using "the Flexible System," also known as the "standard printer model;" and (b) using HP's "End to End" system, such as enrolling in HP's Instant Ink or HP+ Printer programs – thus guaranteeing HP can derive profits from the consumer over the entire lifespan of the printer.

63.    HP's stated preference is for consumers to move to the "End to End" system wherein the customer is both technologically and contractually obligated to purchase only HP Original cartridges.[49]

64.    If customers shift to the "End to End" model, HP could reduce its mix of unprofitable customers. To that end, HP uses a variety of tactics to deceive consumers into believing that their Class Printer purchases provide a "flexible choice."

65.    In reality, HP periodically pushes out firmware[50] updates that act as malware which disable the Class Printers' unless an HP Original cartridge is installed ("malicious firmware updates").

66.    As stated above, for a cartridge to be compatible with a printer, both the hardware – *i.e.*, the physical form of the cartridge - and the software – *i.e.*, the code written onto the chips embedded in

---

[48] *Id.* at ¶¶ 76-77.

[49] *See* 2020 Investor Tech Talk.

[50] Firmware is defined as the set of software installed by the manufacturer on your device. *See also HP Blocks Users from Changing their Firmware Settings,* THE RECYCLER (Oct. 27, 2021), https://www.therecycler.com/posts/hp-blocks-users-from-changing-firmware-settings/ (detailing how HP blocked users from changing their firmware settings).

both devices – must align.

67.     HP's malicious firmware updates disable aspects of the Class Printers' functionality by altering the printers' code.

68.     This malware disables printing if third-party cartridges are installed or if the Class Printer Owner attempts to install a third-party cartridge. This malware further instructs the Class Printer to display a (false) error message. The false error messages state that the printer is experiencing a "supply problem," "cartridge communication error," or "cartridge problem."



69.     After a malicious firmware update, overwhelmed consumers must either accept that their Class Printers are useless or must purchase HP Original cartridges at premium prices – joining the fold of "loyal" profitable consumers, just as HP desires.

70.     HP's repeated malware transmissions affected almost every model of HP InkJet printers, as well as the corresponding third-party cartridges that were in the printers or were already purchased by Plaintiffs and Class Members at the time the update was transmitted or activated.

71.     The malware caused damage to Plaintiffs' and Class Members' printers. HP's conduct was unilateral, unsolicited, misleading, and deceptive. HP did not seek consent from, advise, or explain the malware or the update to Plaintiff and Class Members. HP simply surreptitiously collected data from Class Printers, then transmitted the update which disabled Class Printers using third party ink cartridges. Plaintiffs and Class Members did not authorize HP to transmit the update or to cause damage to their printers.

72.     In addition, HP made misrepresentations and omissions of material fact regarding the firmware updates. At the point of sale, HP omitted material facts concerning its well-conceived business

plan to periodically disallow competing supplies. After HP transmitted the updates, HP made false statements to conceal its role and the nature of the update. HP caused a message to be displayed claiming that the printer had a "Supply problem," "Cartridge Problem," or "Cartridge Communication Error" when a competitor's supply cartridge was installed. HP did not attribute the problem to a firmware update, malware transmission, or other conduct on its part.

        3.    <u>Numerous regulatory agencies and courts worldwide have found HP's conduct unlawful and anticompetitive, and HP implements the same strategies in the United States geographic market.</u>

73.    HP has faced regulatory and legal backlash abroad and in the United States for its unlawful and anticompetitive practices in foreign countries and Plaintiffs are informed and believe that HP utilizes the same practices to deceive, defraud, and mislead consumers and suppress competition in the United States.[51]

74.    For example, Italy's governmental regulator, the Italian Competition Authority ("ICA"), fined HP €10 million for misleading and aggressive commercial practices. In a December 9, 2020 press release, the ICA "found that the limitations on the use of non-original cartridges are not adequately highlighted on the sales packages." In addition, the limitations on the use of non-original cartridges are "renewed and modified through subsequent printer firmware updates [. . .] without properly informing them of the consequences of these updates" when the firmware disseminated, on its website, or when customers sought assistance.[52]

75.    The ICA also found HP obtains and records whether customers use HP Original or third-party compatible cartridges and has created "Big Data" infrastructure using that covertly acquired data; HP uses this "Big Data" infrastructure when formulating its commercial strategies and also uses this

---

[51] *See, e.g.*, HP 2021 10-Q at 39-42, *available at* https://s2.q4cdn.com/602190090/files/doc_financials/2021/q3/HP-7.31.21-10Q-(Q3)-(NG)-(1).pdf (last visited Mar. 3, 2022) (detailing ongoing litigation and regulatory matters worldwide related to HP's conduct described herein.).

[52] ICA Press Release, *available at* https://em.agcm.it/en/media/press-releases/2020/12/PS11144 (last visited Mar. 23, 2022).

information to deny assistance to third-party cartridge users.[53]

76.    The ICA's translated notice reads:

**COMMUNICATIONS FOR THE PROTECTION OF THE CONSUMER**

COMPANIES HP INC. AND HP ITALY S.R.L (CONGUINTELY HP)

1.  have induced consumers and [small businesses] to purchase HP branded printers and to update the firmware installed on them, failing to inform them of the limitations therein regarding the use of non-original ink / toner cartridges and providing omissive and misleading information regarding quality of non-original ink refills, such as to lead one to believe that non-original cartridges cannot be used or have to be replaced due to deficiencies or defects in the latter, rather than due to the limitations introduced by specific instructions contained in the printer firmware ;

2.  have given, through the firmware and without the knowledge of their customers, instructions according to which the printers record operating data – relating to the cartridges used, original or not – and send them to an archive that HP uses for the formulation of their business strategies and, for HP printers that have used non-genuine cartridges, have denied the warranty and refused to certify the causal link between the malfunction of the printer and the use of the legal guarantee of conformity by the vendors.

*Practice No. 1 was deemed incorrect pursuant to art. 20, 21 and 22 of the Consumer Code and practice no. 2 was deemed incorrect pursuant to art. 20, 24 and 25 of the Consumer Code.*[54]

77.    Additionally, in 2021, Amsterdam Court of Appeals ruled that HP acted unlawfully due to incorrect and inadequate information about the cause and solution of a blockade [firmware update] of private label cartridges implemented by HP worldwide in September 2016.[55] The Amsterdam Court of Appeal ruled that HP is liable for the damage suffered by participants of Stichting 123inkt private label

---

[53] *See supra* pp. 14-15, discussing HP's use of "Big Data" to "drive [unprofitable consumers] to HP products."

[54] *Italy Posts Notice on their Website,* THE RECYCLER, https://www.therecycler.com/posts/hp-italy-posts-notice-on-their-website/ (last visited Mar. 3, 2022).

[55] *See* 2021 10-Q at 39.

SECOND AMENDED CLASS ACTION COMPLAINT                    No. 5:22-cv-02327-BLF

customers.[56]

Plaintiffs are informed and believe that these are the same tactics employed in the United States geographic market to defraud and deceive Plaintiffs and Class Members and unfairly reduce competition in the aftermarket for HP InkJet Cartridges.

      **D.**    **HP Used the Playbook to Deceive and Defraud Class Printer Owners**

    78.    HP's practice of covertly collecting information from the Class Printers and then sending firmware updates to disable Class Printers using third-party cartridges ramped up during 2020.[57] In just 15 months HP sent the malware to over sixty (60) models of HP Inkjet printers, disabling those using third-party cartridges and/or permanently removing the capability to use third-party cartridges, including the Class Printers.[58]

    79.    For example, on or about March 17, 2020, soon after the many states issued the first "lockdown" orders in the United States, HP issued a firmware update to printers associated with the HP 903XL and 953XL model cartridges, two of its most popular models.[59] The update "effectively shut down any printer that was using third-party inks."[60]

    80.    Plaintiffs are informed and believe that HP's decision to push out malicious firmware

---

[56] *Netherlands Supreme Court Rejects Appeal,* THE RECYCLER,
https://www.therecycler.com/posts/netherlands-supreme-court-rejects-appeal/ (last visited Mar. 3, 2022).

[57] *See* https://www.therecycler.com/posts/hp-issues-the-most-firmware-updates-so-far/ (last visited Mar.13, 2022); THE RECYCLER, *HP Firmware In the Firing Line Again*,
https://www.therecycler.com/posts/hp-firmware-in-the-firing-line-again/ (last visited Mar. 13, 2022).

[58] THE RECYCLER, *HP Firmware In the Firing Line Again*,  https://www.therecycler.com/posts/hp-firmware-in-the-firing-line-again/ (last visited Mar. 13, 2022).

[59] Plaintiff is informed and believes this malicious firmware update affected, at least, HP OfficeJet 6950, 6962, OfficeJet Pro 6900, 6970, 7720, 7730, 7740, 8210, 8710, 8720, 8730, and 8740 printers.

[60] David Gibbons, *HP Continues to Target Workers at Home During Crisis,* RTM WORLD (Mar. 26, 2020), https://www.rtmworld.com/news/hp-continues-to-take-advantage-of-those-working-from-home/ (last visited Feb 10, 2022).

SECOND AMENDED CLASS ACTION COMPLAINT        No. 5:22-cv-02327-BLF

updates in the wake of the COVID-19 lockdowns was a strategy to "lock out aftermarket cartridges as business temporarily transitions to the home office."[61] While consumers adapted to work-from-home and struggled to adapt to life where a printer was now vital to working, child-rearing, and managing day-to-day administrative tasks, HP chose to capitalize on its captive consumer base by repeatedly rendering third-party cartridges useless.[62] Frustrated customers opined "With the problems we are facing in the world right now and SO MANY people having to work from home this latest strike at their customers could not have come at a worse time. Blood suckers . . . . they should be heavily fined for doing what they already know is illegal AND for price gouging at a time when many companies are going out of business due to the virus and yet most that can are volunteering to do things to help . . . but not HP."[63]

81.     Following immense consumer backlash, HP posted a now-deleted message on its website[64] and Vanessa Yanez, the Worldwide Head of Print Communications at HP, released a statement on LinkedIn: "Hello, I work for HP. This is a situation that shouldn't have happened and we are addressing it. If you have an HP OfficeJet or OfficeJet Pro printer and some of your non-HP branded cartridges are not working, please contact us here [https://bit.ly/2QBdxiA]."[65]

---

[61] David Gibbons, *HP Action Angers Printer Cartridge Association*, RTM WORLD (Mar. 26, 2020), https://www.rtmworld.com/news/hp-action-angers-printer-cartridge-association/.

[62] *HP: More firmware pandemic issues*, THE RECYCLER (July 30, 2020), https://www.therecycler.com/posts/hp-firmware-update-blocks-aftermarket-cartridges/ (last visited Mar. 13, 2022).

[63] THE RECYCLER, *HP Firmware In the Firing Line Again*,  https://www.therecycler.com/posts/hp-firmware-in-the-firing-line-again/ (last visited Mar. 13, 2022).

[64] Though this webpage has been removed, it was formerly located at https://support.hp.com/us-en/document/c06599615.

[65] Similarly, this link no longer functions. *See* David Gibbons, *HP Continues to Target Workers at Home During Crisis*, RTM WORLD (Mar. 26, 2020), https://www.rtmworld.com/news/hp-continues-to-take-advantage-of-those-working-from-home/ (last visited Feb. 10, 2022).

82.     Yet, despite its initial walk back, HP continued pushing malicious firmware updates to Class Printer owners throughout 2020, and, as Plaintiff is informed and believes, into 2021. [66]

83.     Plaintiffs are informed and believe that HP sent malicious firmware updates to Class Printer owners in at least April, June,[67] July,[68] November, and December of 2020. [69]

84.     To date, HP's firmware updates have affected at least sixty (60) models of their InkJet printers.[70]

**E.      HP's Continued Conduct**

85.     HP has flatly refused to acknowledge the sole purpose of the malicious firmware updates is to block the use of third-party cartridges and that it covertly pulls data from each printer it sells - including every printer purchased by Plaintiffs and Class Members.

86.     HP is fully aware that, at the point of sale, customers expect to be able to use third-party cartridges with their Class Printers and are later harmed by its practices. Even still, HP has provided no notice of its data collection practices and the purposes thereof or of the actual consequences of the malicious firmware updates and the damage those malicious firmware updates are certain to cause in

---

[66] https://www.therecycler.com/posts/hp-issues-the-most-firmware-updates-so-far/

[67] Plaintiff is informed and believes that in June of 2020, HP released a firmware update that affected the DeskJet/Ink Advantage 26 series of printers that use 65/304/803/680/664/123 series inkjet cartridges.

[68] Plaintiff is informed and believes that in July of 2020, HP issued another firmware update to printers using HP 63/302 series cartridges, affecting the HP OfficeJet 5220, 5255, 5230, 5232, HP ENVY 5020, 5032 and HP DeskJet 2621 devices.

[69] THE RECYCLER, *HP Issues the Most Firmware Updates So Far*, https://www.therecycler.com/posts/hp-issues-the-most-firmware-updates-so-far/ (last visited Mar. 13, 2022).

[70] *See* THE RECYCLER, *HP Firmware Update Blocks Aftermarket Cartridges*, https://www.therecycler.com/posts/hp-firmware-update-blocks-aftermarket-cartridges/ (last visited Mar. 13, 2022); THE RECYCLER, *More Firmware Dark Arts from* HP, https://www.therecycler.com/posts/more-firmware-dark-arts-from-hp/ (last visited Mar. 13, 2022).

SECOND AMENDED CLASS ACTION COMPLAINT                            No. 5:22-cv-02327-BLF

Class Printers.

87. Although HP is aware of the damage it causes to its customers, HP has engaged in the following acts and omissions:

    a) Promoting and selling printers it knew would lose functionality at HP's intentional sending of after malicious firmware updates intended to stop non-HP printer cartridges from functioning;

    b) Failing to disclose, prior to, at, and after the time of purchase any and all known material facts pertaining to capabilities of the Class Printers, including that HP would intentionally send software updates that would make the Class Printers nonfunctional;

    c) Promoting and selling Class Printers despite knowing that customers do not expect the Class Printer to suddenly malfunction or totally lose functionality;

    d) Failing to disclose that the Class Printers would lose functionality, and representing through advertising, product packaging, press releases, and other sources that the Class Printers possess particular qualities that were inconsistent with HP's actual knowledge of the product;

    e) Sending repeated malware transmissions that caused a loss of functionality to its own customers;

    f) Misinforming the customers about the cause of the damage;

    g) Accessing the Class Printers and collecting, among other things, data on the type of cartridges that were being used to operate the devices without the users' knowledge or permission;

    h) Using information gathered, covertly and without authorization, about its customers to identify customers using third-party cartridges and targeting those customers for malicious firmware updates with the intent of increasing its market share in the HP InkJet Cartridge aftermarket.

    i) Sending malware updates that caused repeated instances of printer failure and never adequately informing consumers of the consequences of the firmware updates or of the cause of the damage to their Class Printers; and

SECOND AMENDED CLASS ACTION COMPLAINT        No. 5:22-cv-02327-BLF

j)    Minimizing the scope and severity of the problems with Class Printers, refusing to acknowledge that HP's conduct is part of a larger practice intended to "drive" customers to the use of HP Original cartridges, and failing to provide adequate relief to consumers.

## FACTS SPECIFIC TO DANIEL DYKE

88.    Daniel Dyke is a Florida resident living in Winter Springs, Florida.

89.    Plaintiff Dyke purchased an HP OfficeJet Pro 6978 All-in-One Printer (the "Class Printer") online from HP in or around January 2020.  Prior to purchasing, Plaintiff Dyke researched before purchase and did not see anything indicating that third party (or non-HP-branded) ink cartridges would not work with the Class Printer.  He also does not recall seeing any such disclosures during his purchase process.  This was the third HP brand printer he has owned and, with those previous printers, he had used third-party ink cartridges so had no reason to believe, and saw no disclosures, that the Class Printer would be any different. After receiving the printer, Plaintiff Dyke did not see anything on the box that told him he could not use third-party ink cartridges.

90.    Plaintiff Dyke did not see anything during the purchase process, on the printer box, or when he registered the printer, that HP would collect information regarding his printer and/or the type of cartridges he was using, or would send updates that would disable his printer. Plaintiff Dyke never gave Defendant HP authorization to collect information regarding his printer, the type of cartridges he was using, or to disable his printer.

91.    Plaintiff Dyke used the HP-branded ink cartridge that came with the computer to print and did so with no problems.  He had not tried to use third party ink cartridges because he had enough ink.  However, he understood that he could use either HP cartridges or third-party cartridges.  Nothing he saw before his purchase and during his purchase indicated that his printer would not work if he used third-party ink cartridges..

92.    In approximately fall of 2022, Plaintiff. Dyke inserted a non-HP ink cartridge into the printer and tried to print.  The printer did not work and Plaintiff Dyke spent about ten hours trying to determine why his printer would not print.  He did update the firmware as part of the trouble shooting process.

93.    As a consequence of HP's intentional conduct, Plaintiff Dyke's printer will not print, or

scan.  In addition, he is unable to connect the printer to his computer and so is unable to use the printer to scan.  He receives an error message indicating non-HP cartridges are detected.

94.     The ability to use third party ink cartridges was an important factor in Plaintiff Dyke's decision to purchase his Class Printer. Plaintiff Dyke would not have purchased his Class Printer, would have paid less for the Class Printer, or would have returned the Class Printer had he known HP intended to permanently deprive him of any meaningful choice in the HP InkJet Cartridge aftermarket. If given the option, Plaintiff Dyke would continue to use his printers with reasonably priced third-party cartridges. Had Plaintiff Dyke known that HP would intentionally transmit updates to the printer's software over the Internet that would render the printer incompatible with third-party cartridges, Plaintiff Dyke would not have purchased the printer, would have paid less for the printers, or would have returned each printer within the buyer's remorse period.

95.     In or around December 2021, HP sent out a malicious firmware update intended to affect printers using HP95X, 90X, 63 and 65 series of cartridges. Although Plaintiff Dyke had not tried to use third party ink cartridges right after that update, he is informed and believes that, because the firmware update was intended to affect printers using HP95X, 90X, 63 and 65 series of cartridges, and because his printer used those same cartridges, that the firmware update also affected his computer. Prior to this update, and likely during this update, Plaintiff Dyke is informed and believes that, without disclosing the practice to Plaintiff Dyke and the Class Members, and without their consent, HP collected information from Class Printers to determine which cartridges Plaintiff Dyke and the Class Members were using. The firmware update altered the code and data of the Class Printers so that they no longer worked with third-party cartridges.

**FACTS SPECIFIC TO HENRY SO**

96.     Henry So is a California resident living in Los Angeles, California.

97.     Plaintiff So owns three printers designed and manufactured by HP.

98.     For color printing, Plaintiff So purchased a new HP OfficeJet Pro 6978 All-in-One Printer (the "Class Printer") for $79.99 plus tax on November 22, 2018 at Best Buy in City of Industry, California.  Prior to purchasing, Plaintiff So researched online and looked at user reviews to determine which printer would meet his needs.  In his research, Plaintiff So never saw any information that he

could not use non-HP branded ink cartridges.

99.     Plaintiff So never saw any information that HP would collect information from his printer that would inform HP of the type of ink cartridge he was using.  Plaintiff So never saw any information that HP would use the information it surreptitiously collected to then send software updates that would render his printer nonfunctional.  Plaintiff So never gave Defendant HP authorization to collect information regarding his printer, the type of cartridges he was using, or to disable his printer

100.     The device's packaging contained an initial starter set of Model 902 HP Original cartridges.  Nothing on the box informed Plaintiff. So that he could not use non-HP branded ink cartridges.  Nothing on the box informed Plaintiff So that HP would collect information from his printer that would inform HP of the type of ink cartridge he was using.  Nothing on the box informed Plaintiff So that HP would use the information it surreptitiously collected to then send software updates that would render his printer nonfunctional.

101.     For printing photos, Mr. So purchased a new HP ENVY 7885 All-in-One Printer (the "ENVY 7885") for $229.99 at Best Buy in City of Industry, California on April 10, 2021.  Prior to purchasing, Mr. So researched online and looked at user reviews to determine which printer would meet his needs.  In his research, Mr. So never saw any information that he could not use non-HP branded ink cartridges.  Mr. So never saw any information that HP would collect information from his printer that would inform HP of the type of ink cartridge he was using.  Mr. So never saw any information that HP would use the information it surreptitiously collected to then send software updates that would render his printer nonfunctional.

102.     Nothing on the box informed Mr. So that he could not use non-HP branded ink cartridges.  Nothing on the box informed Mr. So that HP would collect information from his printer that would inform HP of the type of ink cartridge he was using.  Nothing on the box informed Mr. So that HP would use the information it surreptitiously collected to then send software updates that would render his printer nonfunctional.

103.     Mr. So also believed his HP printer purchases allowed him a "flexible choice" in supplies, because Mr. So purchased his HP printers to complement his HP OfficeJet 6962 All-in-One Printer that he had happily been using since 2016 with both HP Original Supplies as well as third-party

cartridges.

104.    After his Class Printer purchase, Plaintiff So continued to purchase both HP Original Supplies from online retailers and third-party compatible cartridges from online and physical retailers for all three printers.

105.    For example, on July 25, 2021, Plaintiff So purchased a four-color pack of Office Depot Brand Tri-Color Ink Cartridge Replacements (Model 902XL) to use in the OfficeJet Pro 6978 from Office Depot in Whittier, California for $69.99 plus tax. Plaintiff So purchased the Office Depot cartridges because they were, at the time, truthfully advertised as compatible cartridges for the OfficeJet Pro 6978. The Office Depot cartridges were compatible when Plaintiff So installed them in his OfficeJet Pro 6978 and Plaintiff So was satisfied with the quality of the printer's output.

106.    In or around December 2021, HP sent out a malicious firmware update intended to affect printers using HP95X, 90X, 63 and 65 series of cartridges. Prior to this update, Plaintiff So is informed and believes that, without disclosing the practice to Plaintiff So and the Class Members, and without their consent, HP collected information from Class Printers to determine which cartridges Plaintiff So and the Class Members were using.  The firmware update altered the code and data of the Class Printers so that they no longer worked with third-party cartridges.

107.    HP did not advise Plaintiff So or the Class Members of the transmission, and did not obtain Plaintiff So's consent for the transmission.

108.    After the transmission, on or around December 16, 2021; Plaintiff So's Class Printer stopped working and the printer misleadingly indicated that it had a supply problem. Despite attempting to install several other cartridges he had available that contained adequate supplies of ink, his printer still did not work.  Plaintiff So then forced to purchase new replacement HP Original cartridges for $63.99[71] from Costco Wholesale in City of Industry, California to continue using the OfficeJet Pro 6978.

109.    As a consequence of HP's intentional conduct, Plaintiff So's printer and supply cartridges were disabled. The Office Depot cartridges were useless. Plaintiff So was effectively forced to purchase

---

[71] Mr. So purchased the Model 902 cartridges, rather than the 902XL, due to the inflated price of HP Original cartridges.

HP Original cartridges. Plaintiff So was forced to replace his Model 902XL Office Depot cartridges with Model 902 HP Original cartridges for $63.99 from Costco Wholesale in City of Industry, California for use in the OfficeJet Pro 6978 to enable his printer to function.

110.    The ability to use third party ink cartridges was an important factor in Plaintiff So's decision to purchase his Class Printer. Plaintiff would not have purchased his Class Printer, would have paid less for the Class Printer, or would have returned the Class Printer had he known HP intended to permanently deprive him of any meaningful choice in the HP InkJet Cartridge aftermarket. If given the option, Plaintiff So would continue to use his printers with reasonably priced third-party cartridges. Had Plaintiff So known that HP would intentionally transmit updates to the printer's software over the Internet that would render the printer incompatible with third-party cartridges, Plaintiff So would not have purchased the printer, would have paid less for the printers, or would have returned each printer within the buyer's remorse period.

## COMPLAINTS FROM HP CUSTOMERS

111.    Numerous other consumers and Class Members reported experiencing the same issue. Below are a few representative examples of (unedited) comments from message boards and internet forums about the problems:

> Also my HP officejet pro 8600 plus doesn't work anymore since I use not original hp ink cartridges. Until may I didn't have any problem to use the cheaper copies. I think it is really bad from HP to treat customers like that. Epson has alternativ printers, which use large inktank, maybe this will be the right time to change the printer…[72]

> I just recently bought a homebrand cartridge (INKTJET from PrintAbout- the 903XL in black) for my printer (HP Officejet pro 6960), because on the website it said that it would work on my printer. I couldn't buy a cartridge of the brand HP because it was urgent and I couldn't wait a week or two. When I put the cartridge inside, it stated (and still does) that I should remove it and reinstall it, which I did but it still won't work! I have literally done everything I could think of, such as cleaning, resetting etc but its still shows an error-sign. I have like an exam coming on and I can't go out to buy

---

[72] https://borncity.com/win/2019/01/20/does-hp-blocks-3rd-party-ink-cartridges-again-on-its-printers-jan-2019/#comment-4727

the right cartridge because of the COVID-19 virus, and I can't wait another week because its urgent.[73]

I have an OfficeJet Pro 6978 that is relatively new and it will not accept 3rd party ink cartridges. When i put one in, despite the cartridges being labeled as "For use in HP" and "Compatible Replacement," when I put one in the machine I get a warning that says, "Remove and reinstall the indicated cartridge, making sure it is correctly installed."[74]

## **CLASS ACTION ALLEGATIONS**

112.    Pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), (b)(3), and (c)(4), Plaintiffs seek certification of the following Classes defined as follows:

**Device Owner Class.** All persons and entities in the United States who own a Class Printer.

**California Device Owner Subclass.** All persons and entities residing in California who own a Class Printer.

**Florida Device Owner Subclass.** All persons and entities residing in Florida who own a Class Printer.

**Damages Subclass**. All persons and entities in the United States who own a Class Printer that displayed a diagnostic error, such as "Supply Problem," "Cartridge Problem," "Cartridge Communication Error," or other similar error code, as a result of HP's transmission of a firmware update and other conduct described in this Complaint.

**California Subclass.** All persons and entities residing in California and States with a similar consumer protection statute to Cal. Civ. Code 1770(a)(15), who own a Class Printer that displayed a diagnostic error, such as "Supply Problem," "Cartridge Problem," "Cartridge Communication Error," or other similar error code, as a result of HP's transmission of a firmware update.

**Florida Subclass.** All persons and entities residing in Florida who own a Class Printer that displayed a diagnostic error, such as "Supply Problem," "Cartridge Problem," "Cartridge Communication Error," or other similar error code, as a result of HP's transmission of a firmware update.

113.    Excluded from the Classes are Defendant; any parent, affiliate, or subsidiary of

---

[73] https://borncity.com/win/2019/01/20/does-hp-blocks-3rd-party-ink-cartridges-again-on-its-printers-jan-2019.

[74] https://borncity.com/win/2019/01/20/does-hp-blocks-3rd-party-ink-cartridges-again-on-its-printers-jan-2019/#comment-4834.

Defendant; any entity in which Defendant has a controlling interest; Defendant's officers or directors; or any successor or assign of Defendant. Also excluded are any Judge or court personnel assigned to this case and members of their immediate families and staff.

114.     Plaintiffs hereby reserve the right to amend or modify the class definitions with greater specificity or division after having had an opportunity to conduct discovery before the Court determines whether class certification is warranted.

115.     The Fed. R. Civ. P. 23(a) elements of Numerosity, Commonality, Typicality, and Adequacy are all satisfied.

116.     **Numerosity. Fed. R. Civ. P. 23(a)(1).** Consistent with Rule 23(a)(1), the Class is so numerous that joinder of all members is impracticable. While Plaintiffs do not know the exact number of Class Members, Plaintiffs believe the Class and the Subclasses are comprised of tens of thousands of members. Plaintiffs are informed and believe that the OfficeJet Pro 6978 was first manufactured, marketed and sold by Defendant HP in approximately 2016.  Plaintiffs are informed and believe that HP no longer manufactures or sells the OfficeJet Pro 6978 but have located other sources, such as Amazon, that do still sell the printer. Plaintiffs do not have access to the number of OfficeJet Pro 6978 printers sold by HP but, based on the numbers of purchaser reviews on various websites where the OfficeJet Pro 6978 is sold, because the number of reviews only represent a fraction of purchasers, Plaintiffs are informed and believe that the class numbers in the tens of thousands.[75] Class Members may be identified through objective means, including through Defendant's records. Class Members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, social media, and/or published notice.

117.     **Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3).** Consistent with Rule 23(a)(2) and with 23(b)(3)'s predominance requirements, this action involves common questions of law and fact as to

---

[75] *See, e.g., https://www.bestbuy.com/site/hp-officejet-pro-6978-wireless-all-in-one-instant-ink-ready-printer-black/5119600.p?skuId=5119600* (Best Buy – 10,430 reviews); https://www.amazon.com/HP-OfficeJet-6978-Wireless-Replenishment/dp/B01FS2W6I8#customerReviews (Amazon – 13,704); https://www.walmart.com/ip/HP-OfficeJet-Pro-6978/405014252 (Walmart - 596 reviews).

SECOND AMENDED CLASS ACTION COMPLAINT                         No. 5:22-cv-02327-BLF

all Class Members, which predominate over any questions affecting individual Class Members. Such questions of law and fact common to the Class include, but are not limited to:

    a.  Whether HP knowingly caused the transmission of a program, information, code, or command that caused damage to Class Printers and supply cartridges;

    b.  Whether HP accessed the Class Printers without Plaintiff's and Class Members' knowledge or authorization, and obtained information about them;

    c.  Whether HP's conduct constitutes prohibited conduct under the CFAA, Cal. Penal Code § 502(c), Cal. Bus. & Prof. Code § 17500, and the fraudulent, unfair, and unlawful prongs of Cal. Bus. and Prof. Code § 17200;

    d.  The method of calculation and extent of damages for Plaintiff and the Class Members;

    e.  Whether Plaintiffs and the Class Members are entitled to restitution and, if so, in what amount; and

    f.  Whether the Court should enter injunctive relief as requested in this complaint on behalf of the Class Members.

118. **Typicality. Fed. R. Civ. P. 23(a)(3).** Consistent with Rule 23(a)(3), Plaintiffs' claims are typical of the claims of the members of the Class. HP's common course of conduct in violation of law as alleged herein has caused Plaintiffs and Class Members to sustain the same or similar injuries and damages. Plaintiffs' claims are typical of the claims of other Class Members in that Plaintiffs and the Class Members sustained damages arising out of Defendant's uniform wrongful conduct in the form of its malicious transmission and malfunction, and the error message that misrepresented the cause of the malfunction. Plaintiffs' claims are thereby representative of and coextensive with the claims of the Class.

119. **Adequacy. Fed. R. Civ. P. 23(a)(4).** Consistent with Rule 23(a)(4), Plaintiffs are adequate representatives of the Class because Plaintiffs are members of the Class and are committed to pursuing this matter against Defendant to obtain relief for the Class. Plaintiffs have no conflicts of interest with Class Members. Plaintiffs' Counsel are competent and experienced in litigating consumer class actions, including product liability matters. Plaintiffs intend to vigorously prosecute this case and

will fairly and adequately protect the interests of the Class. Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other Class Members.

120.      **Superiority. Fed. R. Civ. P. 23(b)(3).** Consistent with Rule 23(b)(3), a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to an individual Plaintiffs may not be sufficient to justify individual litigation. Here, the damages suffered by Plaintiffs and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Defendant, and thus, individual litigation to redress Defendant's wrongful conduct would be impracticable. Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

121.      **Injunctive and Declaratory Relief.** Class certification is also appropriate under Rule 23(b)(2) and (c). Defendant, through its uniform conduct, acted or refused to act on grounds generally applicable to the Class as a whole, making injunctive and declaratory relief appropriate to the Class as a whole.

122.      Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues are set forth above.

123.      Finally, all members of the proposed Class are readily ascertainable. Defendant has access to information regarding the individuals who purchased its Class Printers. Using this information, Class Members can be identified and their contact information ascertained for the purpose of providing notice to the Class.

\\\

\\\

**COUNT I**
**Violations of the Computer Fraud and Abuse Act**
**18 U.S.C. § 1030(a)(2)(C), and § 1030(a)(4)**
**(On Behalf of Plaintiffs and the Device Owner Class)**

124.    Plaintiffs incorporate all preceding paragraphs as if fully set forth here.

125.    18 U.S.C. § 1030(a)(5)(A) creates liability for whoever "knowingly causes the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causes damage without authorization, to a protected computer."

126.    18 U.S.C. § 1030(a)(2)(C) creates liability for whoever "intentionally access a computer without authorization or exceeds authorized access, and thereby obtains . . . information from any protected computer."

127.    18 U.S.C. § 1030(a)(4) prohibits knowingly and with intent to defraud, accessing a protected computer without authorization, or exceeding authorized access, and by means of such conduct furthers the intended fraud and obtains anything of value.

128.    Under 18 U.S.C. § 1030(e)(1) of the CFAA, "computer" means any device for processing or storing data excluding an automated typewriter, portable handheld calculator, or other similar device. Similarly, under the CFAA, a protected computer is any computer which is used in or affecting interstate or foreign commerce or communication.

129.    Plaintiff So's and Plaintiff Dyke's OfficeJet Pro 6978 printers are protected computers under 18 U.S.C. § 1030(e)(2)(B). The Class Printers are also protected computers under 18 U.S.C. § 1030(e)(2)(B).

130.    Further, Plaintiffs' and Class Members' third-party and HP Original cartridges are also protected computers under 18 U.S.C. § 1030(e)(2)(B).

131.    HP intentionally accessed Plaintiffs' printers and the Class Printers "without authorization or exceed[ing] authorized access. . . and thereby obtain[ed] . . . information" in violation of 18 U.S.C. § 1030(a)(2)(C).

132.    HP sent or caused to be sent transmissions of a program, information, code, or command in the form of a firmware update to the Class Printers.

133.    HP intentionally and knowingly sent or caused to be sent this transmission to the Class

Printers.

134.   HP did not have permission or authorization from Plaintiffs and the Class Members to collect any information, or to make any modifications to the Class Printers.

135.   On a repeated basis, HP intentionally accessed Plaintiffs' and Class Members' third-party and/or HP Original cartridges without their authorization or knowledge and obtained information from those computers.

136.   On a repeated basis, HP intentionally accessed Plaintiffs' and Class Members' Class Printers without their authorization or knowledge, or in excess of their authorization, and obtained information about usage data, printing habits, and cartridge type.

137.   Plaintiffs are informed and believe that HP intentionally accessed Class Printers with the intent to obtain information for its Big Data infrastructure and enable HP to formulate and execute its Playbook, a fraudulent scheme intended to suppress competition in the aftermarket for HP InkJet Cartridges and unlawfully and unfairly deprive Plaintiffs and Class Printer owners of any meaningful choice between HP Original supplies and third-party cartridges in that market.

138.   HP intentionally caused damage to the Class Printers. HP's transmission caused damage to the Class Printers by erasing, modifying, or altering the code that had enabled compatibility with third-party cartridges and disabling HP printers' ability to use third-party cartridges. HP caused damage by rendering Plaintiffs' and Class Members' third-party cartridges useless. Class Printers were and are useless if they are equipped with third-party supplies and of diminished capabilities and value permanently as a result of the incompatibility going forward.

139.   HP did not have permission or authorization from Plaintiffs and the Class Members to cause damage to the Class Printers.

140.   HP did not have permission or authorization from Plaintiffs and the Class Members to obtain detailed usage information from their third-party cartridges.

141.   HP knowingly accessed and exfiltrated information from the Class Printers and any installed third-party cartridges with the intent to defraud consumers.

142.   HP used the information it covertly collected from consumers to formulate and execute its "Playbook" – a fraudulent scheme intended to anticompetitively suppress competition in the

aftermarket for HP InkJet Cartridges, compel Class Printer owners to purchase HP Original cartridges at inflated prices, and/or compel HP customers to switch to the more profitable subscription-based "End-to-End" systems like HP+ or Instant Ink.

143.   HP intentionally and knowingly sent or caused to be sent transmissions to the Class Printers with the intent to defraud consumers.

144.   HP's transmissions caused Class Printers to cease functioning if third-party or refilled cartridges were installed; these transmissions were intended to anticompetitively suppress competition in the aftermarket for HP InkJet Cartridges, compel Class Printer owners to purchase HP Original cartridges at inflated prices, and/or compel HP customers to switch to the more profitable subscription-based "End-to-End" systems like HP+ or Instant Ink.

145.   As a direct and proximate result of this misconduct, HP caused damage to Plaintiffs and the owners of the Class Printers within the meaning of 18 U.S.C. § 1030(e)(8). The functioning of the printers was disrupted and a (false) error message was displayed on the printer screens.

146.   Further, as a direct and proximate result of this misconduct, HP caused damage to Plaintiffs and the owners of the third-party cartridges within the meaning of 18 U.S.C. § 1030(e)(8). The third-party cartridges were accessed by HP and rendered useless by HP's conduct.

147.   Plaintiffs and the Class Members suffered losses within the meaning of the CFAA, 18 U.S.C. § 1030(e)(11). Plaintiffs' printers and cartridges were rendered inoperative, even though they still had remaining ink and were fully functioning prior to HP's firmware. Mr. So had purchased Office Depot Branded Tri-Color Ink Cartridges for $69.99, which are now disabled.  Mr. Dyke also has third party ink cartridges he cannot use with his printer.  Mr. So was forced to purchase one or more HP Original cartridges as replacements.  Plaintiffs also have to pay to safely dispose of their unused and useless supplies.

148.   The firmware transmission also caused loss by decreasing the market value of the printers of Plaintiffs and the Class generally, because the Class Printers are now lacking in certain functionality that they had previously.  For example, Mr. So had invested significant amounts in purchasing his printers from HP, as he expected to use them for several years. Mr. So purchased his HP OfficeJet Pro 6978 for $79.99 plus tax.  Mr. Dyke cannot currently use his printer to print or to scan.  Prior to the

firmware transmission, these printers had a low total operating cost because they could function with a variety of cartridges at low cost. However, after the firmware transmission, these printers could only function with high-priced HP Original cartridges.

149.    The firmware transmission also caused loss to Plaintiffs and Class Members, as they had to expend money, time, and labor to investigate and repair and/or replace disabled Class Printers.

150.    Both Plaintiff So and Plaintiff Dyke have incurred damages of at least $100 each, including the price of third-party ink cartridges which can no longer be used, the difference in the value of their printers when they could be used with third-party ink cartridges as well as HP cartridges, and Mr. So incurred damage when he had to purchase over-priced HP ink cartridges to get his printer to work.

151.    Plaintiffs are informed and believe that the Class numbers in the tens of thousands, but, even assuming only 15,000 class members, each class member would have had to have incurred only $0.33 damages as a result of the December 2021 malware dissemination which, Plaintiffs are informed and believe, targeted printers using HP95X, 90X, 63 and 65 series of cartridges, including the OfficeJet Pro 6978, to meet the $5,000 threshold damages. Given that Plaintiff So incurred at least $100 in damages, and it is likely that many of the other class members have incurred similar damages (and at least $0.33), Plaintiffs and the Class Members have incurred at a minimum, $5,000 damages.

152.    Based on HP's violation of the CFAA, Plaintiffs and Class Members seek damages, injunctive and other equitable relief, and all other relief provided for under the law.

## COUNT II
**Violation of the California Comprehensive Computer Data Access and Fraud Act,
Cal. Penal Code § 502, *et seq.*
(On Behalf of Plaintiffs and the Device Owner Class
or, in the alternative, the California Device Owner Subclass)**

153.    Plaintiffs incorporate all preceding paragraphs as if fully set forth here.

154.    California Penal Code § 502 imposes liability on a person who commits certain acts that constitute a public offense. Cal. Penal Code § 502(c).

155.    California Penal Code § 502 prohibits knowing and unauthorized access to computers, computer networks, and computer systems.

156.    The relevant provision of the CDAFA provides that a person is liable who:

(1) Knowingly accesses and without permission alters, damages, deletes, destroys, or otherwise uses any data, computer, computer system, or computer network in order to either (A) devise or execute any scheme or artifice to defraud, deceive, or extort, or (B) wrongfully control or obtain money, property, or data.

(2) Knowingly accesses and without permission takes, copies, or makes use of any data from a computer, computer system, or computer network, or takes or copies any supporting documentation, whether existing or residing internal or external to a computer, computer system, or computer network.

(3) Knowingly and without permission uses or causes to be used computer services.

(4) Knowingly accesses and without permission adds, alters, damages, deletes, or destroys any data, computer software, or computer programs which reside or exist internal or external to a computer, computer system, or computer network.

(5) Knowingly and without permission disrupts or causes the disruption of computer services or denies or causes the denial of computer services to an authorized user of a computer, computer system, or computer network.

Cal. Penal Code § 502(c)(1)-(5).

157.    Class Printers are "computers" and part of a "computer network" or "computer system" under this statute.

158.    HP's transmission is a "computer program or software" and "computer contaminant" under Cal. Penal Code §§ 502(b)(3) and (12).

159.    HP made "access" to the Class Printers under Cal. Penal Code § 502(b)(1) when it sent the malware transmissions. HP caused unauthorized access to all Class Printers from this jurisdiction and is thereby deemed to have personally accessed the Class Printers in this jurisdiction. Cal. Penal Code § 502(j).

160.    HP made "access" to the Class Printers under Cal. Penal Code § 502(b)(1) when it repeatedly recorded and transmitted to HP detailed usage data about the users' printing habits, including, without limitation, amount of ink used, type of cartridge, date/location/time of print. HP caused unauthorized access to all Class Printers from this jurisdiction and is thereby deemed to have personally accessed the Class Printers in this jurisdiction. Cal. Penal Code § 502(j).

161.    HP knowingly sent the transmission and knowingly modified, damaged, destroyed,

recorded, or transmitted information on the Class Printers without the intent or permission of Plaintiffs and Class Members.

   a. In violation of Cal. Penal Code § 502€(1), HP caused the Class Printers to display false error messages stating that there was a "supply problem," "cartridge problem," or "cartridge communication error." HP deployed these false error messages as a scheme to defraud, deceive, and extort Plaintiff and Class Members to purchase new HP Original cartridges from HP.

   b. In violation of Cal. Penal Code § 502(c)(2), HP knowingly accessed and without permission took, copied, and made use of the data concerning the type of cartridges Plaintiff and Class Members were using to operate the Class Printers.

   c. In violation of Cal. Penal Code § 502(c)(3), HP knowingly and without permission used or caused to be used the computer services of the Class Printers by deploying the Class Printers for HP's own purpose to ascertain the type of printer cartridges were being used to operate the Class Printers and communicating that information back to HP.

   d. In violation of Cal. Penal Code § 502(c)(4), HP accessed and without authorization added, altered, damaged, deleted, or destroyed Class Printers' data, programs, or software.

   e. In violation of Cal. Penal Code § 502(c)(5), by disabling Class Printers, HP caused the disruption and denial of computer services to authorized users, such as Plaintiff and the Class Members.

162.   As a direct and proximate result of this misconduct, HP caused damage to the Class Printers, and Plaintiffs and the Class Members suffered losses. Mr. So purchased a new OfficeJet Pro 6978 for $79.99 at Best Buy and the 902XL Office Depot Cartridges for $69.99 at Office Depot. Mr. So's Office Depot cartridges were rendered useless even though they had ink supply remaining at the time of HP's malicious firmware transmission.  To enable his printer to function again, Mr. So had to purchase one or more HP Original cartridges as replacements because of HP's conduct.  Mr. Dyke purchased a new OfficeJet Pro 6978 which does not currently work, and third-party ink cartridges that he cannot use with his printer.  Plaintiffs and Class Members also have to pay to safely dispose of their unused and useless supplies.

163.   HP's transmission caused damage and loss to Plaintiffs and Class Members, including by disabling Class Printers, eliminating or impairing Plaintiffs' and Class Members' use of Class Printers, and depriving Plaintiffs and Class Members of the ability to use previously compatible third-party cartridges in their Class Printers. Mr. So's printer is of lesser value to him than it was previously. Mr.

Dyke purchased a new OfficeJet Pro 6978 which does not currently work, and third party ink cartridges that he cannot use with his printer.  Plaintiffs and Class Members also have to pay to safely dispose of their unused and useless supplies.

164.    The firmware transmission also caused loss by decreasing the market value of the printers of Plaintiffs and the Class generally, because the Class Printers are now lacking in certain functionality that they had previously.  Plaintiff and Class Members had invested significant amounts in purchasing their Class Printers from HP, as they expected to use them for several years. For example,  Prior to the firmware transmission, their printers had a low total operating cost because they could function with a variety of cartridges at low cost. However, after the firmware transmission, these printers could only function with high-priced HP Original cartridges.

165.    HP admits that it charges a higher upfront cost for the Class Printers because, unlike the "End to End" systems, printers using the "standard printing model" are not guaranteed to generate consistent supply revenue.

166.    The firmware transmission also caused loss to Plaintiffs and Class Members in them being forced to expend money, time, and labor to investigate and repair the disabled Class Printers and dispose of the disabled cartridges, which Plaintiffs and Class Members would not have purchased had they known HP was engaged in and would engage in the conduct alleged in this complaint.

167.    The CDAFA allows an individual who "suffers damage or loss by reason of a violation" of economic damages, injunctive and other equitable relief, as well as reasonable attorney's fees and costs, and all other relief provided for under the law.

168.    As an actual and proximate result of HP's conduct in violation of the California CDAFA, Plaintiffs and Class members have been damaged in an amount to be determined at trial. Under Penal Code §§ 502(e)(1) and (2), Plaintiffs and Class Members are entitled to compensatory damages, equitable relief, and reasonable attorneys' fees.

\\\

\\\

\\\

\\\

**COUNT III**
**Violations of the Unfair Competition Law – Unlawful Prong**
**Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL")**
**(On Behalf of Plaintiff So and the Device Owner Class**
**or, in the alternative, the California Device Owner Subclass)**

169.     Plaintiff So incorporates all preceding paragraphs as if fully set forth here.

170.     The UCL proscribes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

171.     The unlawful prong of California Business and Professions Code § 17200 prohibits any unlawful business practices.

172.     HP is a "business" as defined by § 17200.

173.     HP's conduct is unlawful, in violation of the UCL, because HP's conduct described in this complaint constitutes a violation of 18 U.S.C. §§ 1030(a)(5)(A), *et seq.* of the CFAA, Cal. Penal Code § 502, California's False Advertising Law, and the California Consumers Legal Remedies Act ("CLRA") (as alleged in this Complaint) and all constitute separate and cumulative violations of the unlawful prong of § 17200.

174.     Plaintiff and Class Members have suffered damages in the form of lost money or property, ruined supply cartridges, and  devalued printers.

175.     Plaintiff are authorized to pursue a private right of action against HP under § 17204.

176.     Plaintiff and Class Members have no adequate remedy at law because of the ongoing uncertainty as to the functioning of the printer and whether HP will try to interfere with the functioning of their printers again. Plaintiff intends to purchase ink supplies from third parties at a lower cost for use with their Class Printers if the requested injunctive relief is granted.

177.     Plaintiff are entitled to and seek restitution and private as well as public injunctive relief under this section.

\\\

\\\

\\\

\\\

\\\

<u>**COUNT IV**</u>
**Violations of the Unfair Competition Law – Unfair Prong**
**Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL")**
**(On Behalf of Plaintiff So and the Device Owner Class**
**or, in the alternative, the California Device Owner Subclass)**

178.   Plaintiff So incorporates all preceding paragraphs as if fully set forth here.

179.   The UCL proscribes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

180.   The unfair prong of California's Unfair Competition Law prohibits unfair business practices that either offend an established public policy or that are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

181.   HP's repeatedly sent malware transmissions that caused a loss of functionality to its own customers, misinformed customers about the cause of the damage, and accessed the Class Printers and collected data on the type of cartridges used to operate the devices without the users' knowledge or permission. These practices offend an established public policy or are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

182.   HP also acted in an unethical, unscrupulous, outrageous, oppressive, and substantially injurious manner with respect to Plaintiff and the Class Members by engaging in unfair and anticompetitive business practices that harmed consumer welfare. HP engaged in unfair business practices and acts in at least the following respects:

- HP promoted and sold Printers it knew contained hardware that could cause a loss of functionality of those Class Printers if HP transmitted a malicious firmware update;

- HP promoted and sold Class Printers with this hardware, despite knowing that customers do not expect the Class Printer to suddenly malfunction or totally lose functionality;

- HP promoted and sold Class Printers with this hardware, despite knowing that customers expected to use third-party cartridges in their Class Printers without such printers suddenly malfunctioning or totally losing functionality;

- HP failed to disclose that the Class Printers' contained hardware and software that could and would cause a loss of functionality at HP's command;

- HP represented through advertising, product packaging, press releases, and other sources that the Class Printers possess particular qualities that were inconsistent with HP's actual knowledge of the product;

- HP repeatedly sent malware transmissions that caused a loss of functionality to its own customers and misinformed the customers about the cause of the damage;

- HP accessed the Class Printers and collected usage data, including the type of cartridges used to operate the devices without the owners' knowledge or permission;

- HP used the information gathered about its customers to identify customers using third-party cartridges and targeted those customers for malicious firmware updates with the intent of increasing its market share in the HP InkJet Cartridge aftermarket; and

- HP minimized the scope and severity of the problems with Class Printers, refusing to acknowledge that HP's conduct is part of a larger practice intended to "drive" customers to the use of HP Original cartridges and/or "End to End" systems and failed to provide adequate relief to consumers.

These are practices and uniform courses of conduct that offend an established public policy or that are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

183.    The utility of HP's transmissions and untrue statements are very low (as they are fraudulent and anti-competitive) and are vastly outweighed by the serious harm incurred by Plaintiff and Class Members.

184.    Any legitimate purpose or benefit of HP's conduct is substantially outweighed by the harm to consumers, competition, and the general public. There is no legitimate reason why HP should be allowed to secretly install firmware updates disabling previous capabilities without providing its customers a fully informed option to decline the update. There is no legitimate reason why HP should be allowed to obfuscate or deceive its customers about the reasons why their HP Class Printers no longer work with competitors' supplies and HP's role in bringing about the sudden decrease or cessation of functionality. If HP is truly conducting legitimate procedures, then it should inform the customer that the procedures will be conducted, or have been conducted, and not just make vague and misleading statements such as "supply problem," "cartridge problem," or cartridge communication error" that

conceal HP's active and purposeful role in bringing about the problem or provide no advice to customers other than to buy HP Original cartridges at considerable premiums.

185.     Plaintiff was left with uncertainty as to the best course of action after seeing the false error messages. Plaintiff and Class Members had to either purchase a set of overpriced HP Original cartridges, purchase a printer from another manufacturer, or forego printing on using their printers. Unless the Court enjoins further unlawful acts by HP, Plaintiff and Class Members face uncertainty as to which of these choices would minimize their damage. Plaintiff is unsure whether purchasing further third-party cartridges would result in further loss.

186.     Plaintiff and Class Members have incurred and continue to incur damages that are actual and recognized by statute in the form of a damaged printer and destroyed supply cartridges, and loss of money or property.

187.     Plaintiff and Class Members have no adequate remedy at law because of the ongoing uncertainty as to the functioning of the printer and whether HP will try to interfere with the functioning of their printers again. Plaintiff intends to purchase ink cartridges from third parties at a lower cost for use with their Class Printers if the requested injunctive relief is granted.

188.     Plaintiff and Class Members are entitled to and seek restitution and public as well as private injunctive relief under this section.

### COUNT V
**Violations of the Unfair Competition Law – Fraudulent Prong**
**Cal. Bus. & Prof. Code § 17200, *et seq.* ("UCL")**
**(On Behalf of Plaintiff So and the Device Owner Class**
**or, in the alternative, the California Device Owner Subclass)**

189.     Plaintiff So incorporates all preceding paragraphs as if fully set forth here.

190.     The UCL proscribes "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

191.     The fraudulent prong of the UCL prohibits business practices that are likely to deceive the public.

192.     HP's practice of failing to disclose that it would send transmissions to disabled functioning in cartridges, sending transmissions that disabled functioning supply cartridges and

rendered the Class Printers less valuable, and then misrepresenting the cause of the malfunction at the expense of its competitors, is a practice that is likely to deceive members of the public. HP also omitted, without the knowledge or permission of Plaintiff and Class members, that it was accessing the Class Printers and collecting data on the type of cartridges that were being used to operate the devices. HP's omissions of its business practice from potential printer purchasers are likely to deceive members of the public.

193.    HP's conduct is fraudulent in violation of the UCL because it is likely to deceive a reasonable consumer and:

- HP promoted and sold Printers it knew contained hardware that would cause a loss of functionality of those Class Printers if HP transmitted a malicious firmware update;

- HP promoted and sold Class Printers with this hardware, despite knowing that customers do not expect the Class Printer to suddenly malfunction or totally lose functionality;

- HP promoted and sold Class Printers with this hardware, despite knowing that customers expected to use third-party cartridges in their Class Printers without such printers suddenly malfunctioning or totally losing functionality;

- HP failed to disclose that the Class Printers' contained hardware and software that could and would cause a loss of functionality at HP's command;

- HP repeatedly sent malware transmissions that caused a loss of functionality to its own customers and misinformed the customers about the cause of the damage;

- HP accessed the Class Printers and collected usage data, including the type of cartridges used to operate the devices without the owners' knowledge or permission;

- HP used the information gathered about its customers to identify customers using third-party cartridges and targeted those customers for malicious firmware updates with the intent of increasing its market share in the HP InkJet Cartridge aftermarket; and

- HP minimized the scope and severity of the problems with Class Printers, refusing to acknowledge that HP's conduct is part of a larger practice intended to "drive" customers to the use of HP Original cartridges and/or "End to End" systems and failed to provide adequate relief to consumers.

194.    HP had ample means and opportunities to alert Plaintiff and Class Members of the true nature of its so-called firmware updates and intentions to disable certain functionalities within the Class Printers, including on in its advertisements of HP Printers; on the external packaging of HP Original cartridges; in its partners' online purchase portals; in the User Manuals; and as part of the standardized printer setup process. HP uniformly failed to disclose that it intended to permanently disable or damage printers utilizing third-party cartridges. Had HP disclosed this information, Plaintiff and Class Members would not have purchased a printer, would not have purchased a printer at the prices they did, or would have returned their printers during the respective buyer's remorse periods.

195.    HP was under a duty to disclose these practices because of its exclusive knowledge of its intent to disable third-party cartridge compatibility before selling the printers, because the omissions and misrepresentations resulted in material and unreasonable damage to Class Printers, and because customers were left uncertain about the best course of action with respect to their defective printers and now useless cartridges.

196.    Plaintiff and Class Members were unaware of HP's practices until they experienced printer malfunctions. Had HP disclosed the true nature of the firmware updates and data collection practices, Plaintiff and Class Members would have been aware of HP's practices and would not have purchased a Class Printer, would have paid substantially less for it, or would have returned it for a refund.

197.    Absent HP's unlawful, unfair and fraudulent conduct, Plaintiff and Class Members would not have purchased a Class Printer, would have paid substantially less for it, or would have returned it for a refund because HP omitted material information that it was under a duty to disclose and on which Plaintiff and the Class Members would have relied.

198.    Through its unlawful, unfair, and fraudulent conduct, HP acquired Plaintiff's money directly and as passed on by HP's authorized resellers (e.g., Best Buy, Amazon, and Staples). Plaintiff and Class Members suffered injury in fact, including lost money or property, as a result of HP's unlawful, unfair, and fraudulent conduct.

199.    Plaintiff and Class Members accordingly seek appropriate relief, including: (1) restitution under the UCL; and (2) such orders or judgments as may be necessary to enjoin HP from continuing its

unfair, unlawful, and fraudulent practices. Plaintiff also respectfully seeks reasonable attorneys' fees and costs under applicable law, including under California Code of Civil Procedure Section 1021.5.

### COUNT VI
**California False Advertising Law**
**Cal. Bus. & Prof. Code § 17500**
**(On Behalf of Plaintiff So and the Device Owner Class**
**or, in the alternative, the California Device Owner Subclass)**

200.    Plaintiff So incorporate all preceding paragraphs as if fully set forth here.

201.    HP violated Cal. Bus. & Prof. Code § 17500 by using misleading statements and material omissions, to promote the sale of HP's Original cartridges, HP ink subscription services, and/or new HP Printers and otherwise "concerning any circumstance or matter of fact connected with the proposed performance or disposition of services."

202.    Class Printers do not possess the level of quality or value that HP promised.

203.    HP made uniform material omissions by failing to disclose that it would collect information from Plaintiff's and the Class Members' Class Printers regarding ink cartridge usage, and would subsequently disable the printers so they would no longer function with third-party ink cartridges, communicating to Plaintiff and Class Members that Class Printers were compatible with generic third-party ink cartridges and that Plaintiff and Class Members could choose between HP Original cartridges or third-party cartridges, when that was not in fact true.

204.    HP made material omissions regarding its business practice of using the pretext of updating the firmware on its printers as a scheme to disrupt and disable third-party cartridges from its systems unfairly and coerce Plaintiff and Class Members to buy HP Original cartridges that are sold for substantial and unjustified premiums. HP also omitted, without the knowledge or permission of Plaintiff and Class Members, that it was accessing the Class Printers and collecting data on the type of cartridges that were being used to operate the devices. Plaintiff and Class Members wanted to use their devices with reasonably priced third-party cartridges.  Had Plaintiff and Class Members known that HP employed such tactics, they would not have purchased a Class Printer in the first place.

205.    HP made uniform material omissions that communicated to Plaintiff and Class Members that there was an issue with their cartridges when that was false – just moments before HP sent the

transmissions, there had been no problem. HP omitted the material fact that the purported supply problem was caused by HP's intentional transmission of malicious firmware designed to render third-party supplies incompatible with HP printers.  HP had a duty to disclose the truthful cause of the problem.

206.    HP knew, or in the exercise of reasonable diligence should have known, that its omissions were misleading at the time it made them. HP deliberately provided false representations and omissions to prevent customers from learning the intentional and unlawful design of HP's firmware updates and authentication procedures and further inducing its customers to purchase new supply cartridges from HP.

207.    HP had a duty to disclose that its conduct would constitute a material defect that relates to the central function of the printer—*i.e.*, its ability to use supply cartridges to print on an ongoing basis. HP also had a duty to disclose that it was collecting information on users without their knowledge or permission for its own purposes—*i.e.*, determining whether customers were using HP Original or competitors' third-party cartridges.

208.    HP's false and misleading advertising statements deceived the general public.

209.    As a direct and proximate result of HP's misleading and false advertising, Plaintiff and Class Members have suffered injury-in-fact and have lost money and property.

210.    Plaintiff and Class Members reasonably relied to their detriment on HP's material omissions regarding its firmware updates and the purported error messages presented by HP.

211.    Plaintiff and Class Members were left with uncertainty as to the best course of action after seeing the false error messages. Plaintiff and Class Members had to either purchase a set of overpriced HP Original cartridges or throw away their HP printer and purchase a printer from another manufacturer. Unless the Court enjoins further unlawful acts by HP, Plaintiff and Class Members face uncertainty as to which of these choices would minimize their damage.  Of the moneys paid to partner retailers like Staples, BestBuy, CostCo, and Amazon, HP received the majority of those moneys.

212.    Plaintiff and Class Members seek to enjoin, under Bus. & Prof. Code § 17535, the violations described herein and to require HP to issue appropriate corrective disclosures and software

fixes.

213.   HP's false advertising will continue to harm consumers unless and until it is enjoined.

214.   Plaintiff and Class Members therefore seek an order requiring HP to cease its false advertising and unlawful practices, provide full restitution of all monies HP derived from its false advertising, interest at the highest rate allowable by law, and for an award of reasonable attorney's fees and costs under applicable law, including Code of Civil Procedure § 1021.5.

**COUNT VII**
**Fraud By Omission**
**(On Behalf of Plaintiff So and the Device Owner Class**
**or, in the alternative, on behalf of Plaintiff So and the California**
**and Plaintiff Dyke and the Florida Device Owner Subclasses)**

215.   Plaintiffs incorporate all preceding paragraphs as if fully set forth here.

216.   Plaintiff So brings this claim on behalf of the Device Owner Class under California law or, alternatively, Plaintiff So brings this claim on behalf of the California Consumer Subclass, and Plaintiff Dyke brings this claim on behalf of the Florida Consumer Subclasses under the law of the state in which each respective Plaintiff purchased a Class Printer.

217.   HP failed to disclose material facts about the malicious firmware updates it pushed to its consumers. Further, HP failed to disclose material facts about the damaging functionality of the software installed within its printers. As alleged herein, HP knew that the printers could and would reject third-party cartridges upon firmware updates before the Plaintiffs sand Class Members purchased them. Further, HP was aware of numerous consumer complaints concerning compatibility issues with third-party cartridges, but never disclosed the true nature of the firmware updates to Plaintiffs and Class Members.

218.   Because the technology that disables third-party cartridge compatibility is latent and unobservable until it is triggered by HP, Plaintiffs and Class Members had no reasonable means of knowing that HP's representations concerning the Class Printers were incomplete, false, misleading, or that it had failed to disclose that it intended for third-party cartridges to permanently lose compatibility and the printers using those cartridges to entirely lose functionality. Plaintiffs and Class Members did not and reasonably could not have discovered HP's deceit before they purchased the Class Printers or

before the end of their buyer's remorse periods. Plaintiffs and Class Members reasonably believed that they could use either third-party ink cartridges or HP Brand ink cartridges in their Class Printers.

219.    HP made material omissions regarding its business practice of using the pretext of updating the firmware on its printers as a scheme to disable third-party supplies from its systems unfairly and coerce Plaintiffs and Class members to buy HP Original cartridges that are sold for substantial and unjustified premiums. HP also omitted, without the knowledge or permission of Plaintiffs and Class members, that it was accessing the Class Printers and collecting data on the type of cartridges that were being used to operate the devices. Plaintiff wanted to use their devices with reasonably priced third-party cartridges.  Had Plaintiffs and Class members known that HP employed such tactics, they would not have purchased a Class Printer in the first place.

220.    HP made uniform representations and material omissions that communicated to Plaintiffs and Class members that there was a "supply problem," "cartridge communication error," or "cartridge problem," when that was false – just moments before HP sent the transmission, there had been no problem. HP omitted the material fact that the purported problem was caused by HP's intentional transmission of firmware designed to render third-party supplies incompatible with HP printers.  HP had a duty to disclose the truthful cause of the problem.

221.    Had Plaintiffs and Class Members known of HP's intention to disable third-party cartridges, they would not have purchased a Class Printer, would not have purchased it at the price they did, or would have returned it during their respective buyer's remorse periods. Plaintiffs and Class Members reasonably believed HP's representations that the Class Printers provided consumers with a choice in the HP InkJet Cartridge aftermarket.

222.    HP had a duty to disclose the true nature of the firmware updates to Plaintiffs, Class Members, and the public because HP's conduct with respect to the updates results in material and unreasonable damage to the property of Plaintiffs and Class Members and HP possessed exclusive knowledge of it.

223.    HP knew, or in the exercise of reasonable diligence should have known, that its representations and omissions were false and misleading at the time it made them. HP deliberately provided false representations and omissions to prevent customers from learning the intentional and

unlawful design of HP's firmware updates and authentication procedures and further inducing its customers to purchase new supply cartridges from HP.

224.    HP had a duty to disclose that its conduct would constitute a material defect that relates to the central function of the printer—*i.e.*, its ability to use supply cartridges to print on an ongoing basis. HP also had a duty to disclose that it was collecting information on users without their knowledge or permission for its own purposes—*i.e.*, determining whether customers were using HP Original cartridges or its competitors' third-party cartridges.

225.    HP failed to disclose the true nature of the firmware updates to sell more HP Original cartridges at a premium price, prevent damage to its brand, and turn the so-called "compatibility issues" into an opportunity to direct HP's consumers to the more profitable "End to End" systems, such as HP+ or Instant Ink, wherein consumers are contractually or technologically obligated to purchase all of their supplies directly from HP.

226.    Plaintiffs and other Class Members were deprived of the "flexibility" to choose which cartridges to purchase in the HP InkJet Cartridge aftermarket. HP intentionally deprived Plaintiffs and Class Printer owners of this choice.

227.    The facts about the firmware updates that HP suppressed and omitted were material to a reasonable objective consumer, and Plaintiffs and Class Members were unaware of them until they experienced printer malfunctions. Had HP disclosed the true nature of HP's anticompetitive scheme, Plaintiffs and Class Members would have been aware of it, and would not have purchased a Class Printer, would have paid substantially less for it, or would have returned it for a refund.

228.    When deciding to purchase a Class Printer, Plaintiffs and Class Members reasonably relied to their detriment upon HP's material omissions regarding Class Printers and HP's intention to send malicious firmware updates that would disable functionality in their printers and damage the cartridges contained therein.

229.    Plaintiffs and Class Members sustained damages as a direct and proximate result of HP's deceit and fraudulent concealment. Among other damage, Plaintiffs and Class Members did not receive the value of the premium price they paid for the Class Printers.

230.    HP's fraudulent omission was malicious, oppressive, deliberate, intended to defraud

Plaintiffs and Class Members and enrich HP, and in reckless disregard of Plaintiffs' and Class Members' rights, interests, and well-being. HP's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct, to be determined according to proof.

### COUNT VIII
**Violation of the California Consumers Legal Remedies Act ("CLRA")**
**Cal. Civ. Code § 1770(a)(5), *et seq*.**
**(On Behalf of Plaintiff So and the California Subclass)**

231.    Plaintiff So incorporates all preceding paragraphs as if fully set forth here.

232.    The CLRA prohibits twenty-seven enumerated unfair business practices.

233.    Cal. Civ. Code § 1770(a)(5) of the CLRA prohibits representing that a seller's goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have.

234.    Cal. Civ. Code § 1770(a)(7) of the CLRA prohibits representing that its goods or services are of a particular standard, quality, or grade, if they are of another.

235.    Cal. Civ. Code § 1770(a)(9) of the CLRA prohibits advertising goods and services with the intent not to sell them as advertised.

236.    Cal. Civ. Code § 1770(a)(15) of the CLRA prohibits representing that a part, replacement, or repair service is needed when it is not.

237.    Defendant violated Cal. Civ. Code §§ 1770(a)(5) and 1770(a)(7) of the CLRA by failing to disclose that the Class Printers would function using both HP Original cartridges and third-party cartridges when, at the point of sale, HP knew that the Class Printers would eventually only accept HP Original cartridges.

238.    Defendant violated Cal. Civ. Code § 1770(a)(9) of the CLRA when it advertised the Class Printers with the intent not to sell them as advertised.

239.    Defendant violated Cal. Civ. Code § 1770(a)(15) of the CLRA when it falsely told Plaintiff that his cartridges needed to be replaced, when it was actually HP's misconduct that caused the malfunction.

240.    As a result of this violation, on December 16, 2021, Plaintiff So incurred damages in the form of having his Model 902XL Office Depot Brand Inks (worth $69.99 plus tax) ruined and being

forced to spend $63.99 on new HP Original cartridges. Plaintiff's Class Printers also decreased in value as a result of not being able to function with third-party cartridges.

241.    As a result of this violation, Plaintiff and California Consumer Subclass Members have been deprived of the "flexible choice" HP represented would accompany the Class Printers. Had Plaintiff and State Subclass Members known that HP would intentionally disable the functionality of the Class Printers if third-party cartridges were installed, Plaintiff and California Subclass Members would have paid less for their Class Printers, would have returned the Class Printers during the respective buyer's remorse periods, or would not have purchased the Class Printers at all.

242.    Under Cal Civ. Code § 1781(a), any consumer who suffers damage as a result of a violation of this section may bring a class action on behalf of himself and all those similarly situated.

243.    On February 23, 2022, pursuant to Cal. Civ. Code § 1781(a)(1) and (2), Plaintiff So sent notice of the violation and demand for correction to HP's Palo Alto headquarters via certified mail, return receipt requested, and email.

244.    Plaintiff has no adequate remedy at law because he is currently unable to determine whether he will be able to use third-party cartridges in the future in any of his three Class Printers, and he is uncertain whether HP will attempt to further interfere in his use of his printers. Plaintiff was left with uncertainty as to the best course of action after seeing the false error message. Plaintiff and the California Subclass Members had to either purchase a set of overpriced HP Original cartridges or throw away their HP printer and purchase a printer from another manufacturer. Unless the Court enjoins further unlawful acts by HP, Plaintiff and the California Subclass Members face uncertainty as to which of these choices would minimize their damage. Plaintiff needed to print right away, so he purchased a new set of the smaller Model 902 HP Original cartridges from Costco for $63.99. HP benefitted substantially from Plaintiff's purchase because HP received the majority of the revenue from the purchase.

245.    Therefore, Plaintiff and the California Subclass are entitled to injunctive relief, actual damages, restitution, punitive damages, and all other relief that the court deems proper, including costs and attorney's fees, under Cal. Civ. Code § 1780.

\\\

**COUNT IX**
*Violations of the Florida Deceptive and Unfair Trade Practices Act (FDUTPA),*
**Fla. Sta. § 501.201** *et seq.*
**(On behalf of Plaintiff Dyke and the Florida Subclass)**

246.     Plaintiff Dyke incorporates by reference each preceding paragraph as though fully set forth herein.

247.     Plaintiff Dyke brings this claim under the laws of Florida, individually and on behalf of the Florida Subclass.

248.     Plaintiff Dyke, and the Florida Subclass Members are "consumers" as defined by Fla. Stat. § 501.203(7).

249.     HP engaged in "trade or commerce" as defined by Fla. Stat. § 501.203(8).

250.     The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. § 501.204(1).

251.     HP's acts and practices, described herein, are unfair in violation of Florida law for the reasons stated below.

252.     In the course of its business, HP concealed, suppressed, and failed to disclose material facts concerning the Class Printers.  HP also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Printers.

253.     HP thus violated the FDUTPA by, at a minimum, employing deception, deceptive acts or practices, fraud, concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Printers.

254.     HP intentionally and knowingly omitted material facts regarding the Class Printers with intent to mislead Plaintiff Dyke and the Florida Subclass members into relying upon HP's omissions when deciding to purchase Class Printers.

255.     HP owed Plaintiff Dyke and the Florida Subclass a duty to disclose the true nature of the Class Printers because Defendant: (a) possessed exclusive knowledge about the Defect; (b) intentionally

concealed the foregoing from Plaintiff Dyke and the Florida Subclass; and (c) made incomplete representations about the Class Printers, while purposefully withholding material facts from Plaintiff Dyke and the Florida Subclass that contradicted these representations.

256. HP knew this information at the time of sale because it intentionally collected information from the Class Printers, and sent malware updates to disable Class Printers from using third party ink cartridges.

257. HP knew or should have known that its conduct violated the FDUTPA.

258. HP's unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiff Dyke.

259. By engaging in the above-described acts and practices, HP has committed one or more acts of unfair competition.

260. HP's acts and practices have deceived and/or are likely to deceive members of the consuming public and the members of the Class.

261. Plaintiff Dyke and the Florida Subclass suffered ascertainable loss and actual damages as a direct and proximate result of HP's misrepresentations, its concealment of and failure to disclose material information. Plaintiff Dyke and the Florida Subclass members who purchased the Class Printers would not have purchased them or would have paid significantly less had the omitted information been disclosed.

262. HP had an ongoing duty to Plaintiff Dyke and Florida Subclass to refrain from unfair and deceptive practices under the FDUTPA. All owners of the Class Printers suffered ascertainable loss in the form of the diminished value of their Class Printers as a result of HP's deceptive and unfair acts and practices made in the course of HP's business.

263. Plaintiff Dyke and Florida Subclass members are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and reasonable attorneys' fees under Fla. Stat. § 501.2105(1).

264. Plaintiff Dyke and the Florida Subclass also seek an order enjoining HP's unfair and deceptive acts or practices pursuant to Fla. Stat. § 501.211, and any other just and proper relief available under the FDUTPA.

\\\

SECOND AMENDED CLASS ACTION COMPLAINT                         No. 5:22-cv-02327-BLF

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and the Classes defined above, respectfully requests that this Court:

A.     Determine that the claims alleged herein may maintained as a class action under Federal Rule of Civil Procedure 23, enter an order certifying the Classes defined above, and appointing Plaintiffs' counsel as Class Counsel and Plaintiffs as the representatives of the Classes;

B.     Enter an order declaring that Defendant's actions, as set out above, violate the CFAA under 18 U.S.C. § 1030(a)(4), § 1030(a)(5)(A), and § 1030(a)(2)(C);

C.     Enter an order declaring that Defendant's actions, as set out above, violate California Penal Code § 502(c)(1)-(5);

D.     Enter an order declaring that Defendant's actions, as set out above, violate the fraudulent, unfair, and unlawful prongs of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200.

E.     Enter an order declaring that Defendant's actions, as set out above, violate Cal. Civ. Code § 1770(a)(5), *et seq*;

F.     Grant an injunction requiring Defendant to cease the unlawful business practices described herein and otherwise protecting the interests of Plaintiffs and the Classes, including requiring HP to reverse the effects of its malware transmissions insofar as they render once-compatible third-party cartridges obsolete, cease accessing the Class Printers to obtain customer data without permission, and prohibiting HP from sending such transmissions in the future without obtaining the fully informed prior consent of each printer owner;

G.     Award all actual, general, special, incidental, statutory, punitive, and consequential damages to which Plaintiffs and Class Members are entitled;

H.     Award pre-judgment and post-judgment interest as provided by law;

I.     To the extent an adequate remedy at law does not exist: (a) grant appropriate equitable

---

SECOND AMENDED CLASS ACTION COMPLAINT                                    No. 5:22-cv-02327-BLF

relief, including, without limitation, an order requiring HP to: (1) adequately disclose the true nature of its past malicious firmware updates; and (2) return to Plaintiffs and Class Members all costs attributable to remedying or replacing Class Printer and third-party cartridges, including but not limited to economic losses from the purchase of replacement HP Original cartridges; (b) enjoin HP from pushing out future malicious firmware updates and/or using any of the other tactics described herein to prevent the use of third-party cartridges; and/or (c) grant such other equitable relief to which Plaintiffs and Class Members are entitled.

J.      Award reasonable attorneys' fees and costs as permitted by law; and

K.      Grant such other and further relief as the Court deems appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues triable as of right.

Date: August 16, 2023                    Respectfully Submitted,

_____
            */s/ Michael F. Ram*

**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
Michael F. Ram (SBN 104805)
mram@forthepeople.com
Marie N. Appel (SBN 187483)
mappel@forthepeople.com
711 Van Ness Avenue, Suite 500
San Francisco, CA 94102
Telephone: (415) 358-6913
Facsimile: (415) 358-6293

*Counsel for Plaintiffs and the Putative Classes*